**Everett HARVELL, Plaintiff in Error,**

**v.**

**The STATE of Oklahoma, Defendant in Error.**

**No. A–15122.**

Court of Criminal Appeals of Oklahoma.

Jan. 6, 1971.

Ungerman, Grabel, Ungerman & Leiter, Tulsa, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Dale F. Crowder, David L. Russell, Asst. Attys. Gen., for defendant in error.

## MEMORANDUM OPINION

BUSSEY, Judge.

Everett Harvell, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Sequoyah County of the crime of Shooting with Intent to Kill; his punishment was set at ten years imprisonment and from said judgment and sentence a timely appeal has been perfected to this Court.

Briefly stated, the evidence at the trial adduced that on August 12, 1967, the defendant went to a tavern located east of Sallisaw. Jim Baty, the bartender, testi-

fied that the defendant came into the bar, bought a beer and left for approximately five minutes. He then re-entered the tavern carrying a rifle and pointed it at Baty. The defendant asked Baty if he knew who he was and to get out from behind the bar because he was going to kill him. Baty pleaded with the defendant not to shoot because of his children. The defendant fired three shots at Baty, two of which hit him in the left leg and right hip. Baty, a former policeman, had struck the defendant's father on the head with a pistol while attempting to arrest him several years prior to this date.

Baty, on cross-examination, admitted that he had given the defendant's attorney a different version of what occurred, a week prior to trial. He made that statement because of threats made by the defendant's father that "if I wanted to see that boy grow up, I'd better do what—do as I was told." (CM 70).

Dr. Lockwood testified about the nature and extent of the injuries sustained by Baty as a result of gunshot wounds.

Ray Woodard testified that he was present when the defendant came into the tavern with the rifle. He heard parts of the dialogue between the defendant and Baty. He observed the defendant fire three shots. Baty did not have a gun in his hand, nor did he make any attempt to reach for anything prior to the shots.

Haskell Graves and Mike Zulkey testified substantially to the effect that the defendant came into the bar carrying a rifle and told Baty to get out from behind the bar. They immediately left and heard shots.

Jimmy Sanders entered the tavern at approximately the same time the defendant arrived. He observed the defendant leave and then re-enter with the rifle, ordering Baty to get out from behind the bar. Baty was attempting to talk to the defendant when the first shot was fired. Baty's hands were in clear sight at all times he was talking to the defendant.

Max Newman, a deputy sheriff, identified the cartridges found at the scene.

Katherine Moon testified for the defense that a week prior to the trial she overheard a conversation between Baty and her boss wherein Baty stated he wanted to contact the defendant's father to get some money so he could leave town. Baty was afraid the District Attorney was going to charge him with stealing a gun (CM 152). The defendant testified in his own behalf that he had been drinking heavily prior to going to the tavern. He recognized Baty and decided to beat him up because of what Baty had done to his father. He went back to his car and got the rifle for the purpose of forcing Baty outside to fight without a weapon. He re-entered the tavern and attempted to get Baty to go outside to fight. Baty kept feeling under the bar for a gun and the defendant fired a warning shot. Baty continued to feel for his gun and the defendant fired two shots at his legs. He denied any intention to kill Baty. He admitted on cross-examination that he had served two terms in the penitentiary for forgery and receiving stolen property.

Glenda Harvell, the defendant's wife, testified that about a week before the trial she heard a conversation between Baty and the defendant's father in which Baty said the defendant would not have shot him if he had not been reaching for a gun. Clyde Harvell, the defendant's father, verified this conversation with Baty. He firmly denied any connection or threats made to Baty.

Baty was recalled in rebuttal and acknowledged a conversation with Clyde and Glenda Harvell. The elder Harvell warned him that he had better change his testimony if he wanted to see his little boy grow up. (CM 198).

The defendant's first proposition alleges that the trial court committed reversible error in overruling a Motion for Mistrial after the State's witness referred to the defendant as having been in the penitentiary, and before the defendant had testified.

Jim Baty testified on cross-examination to a defense question as follows:

"Q. After you or before you had this trouble with Clyde, you never had any threats before from Everette or Clyde either one?

A. Everett wasn't here. He was at McAlester when I was working at Muldrow." (CM 74).

■ The defendant contends that the above response by the witness can have only one connotation and that being that the defendant was in prison. The law in this state is clear that it is reversible error to put the defendant's reputation in issue until such time as it is raised by the defendant. Lovell v. State, Okl.Cr., 455 P.2d 735.

■ We are of the opinion that the response of the witness did not, in fact, indicate that the defendant was in prison, thus putting his reputation in issue. We agree with the conclusion of the Attorney General that there are many more people living in McAlester who are not in prison, than those living behind prison walls. We also note that the response was obtained from a question by the defendant. We, therefore, find this proposition to be without merit.

■ The next proposition maintains that the trial court committed reversible error in overruling the defendant's objections to a question propounded by the prosecutor which was calculated to prejudice the jury against the defendant. The testimony of which the defendant complains, was as follows:

"Q. Did you know your sister was up here and brought him down here—your own sister and told the kid to tell the truth; that she was tired of her own

brother killing people and running over people?

Mr. Frye: We object your honor—

Q. Did you know that your own sister did that?

Mr. Frye: We object to that as incompetent, irrelevant and immaterial.

The Court: Overruled and exception allowed." (CM 168–169).

We deem it important that immediately prior to the question in issue that the defendant testified that his brother had made certain statements because of threats by the prosecutor.[1] The defendant contends that the questions were asked for the purpose of degrading and intimidating the defendant and were deliberately calculated to prejudice the jury. The Attorney General argues that the prosecuting attorney was reasonably countering the defendant's assertion that his brother had made certain statements as a result of threats by the prosecutor by showing that the brother made the statements as a result of the urging of his sister.

In Melot v. State, Okl.Cr., 375 P.2d 343, we quoted from the fifth Syllabi of Johnson v. State, 95 Okl.Cr. 1, 237 P.2d 909, wherein we held:

"Where the guilt of the defendant is clear and there is no reason to believe that the jury could arrive at any other verdict but guilty the court will not reverse a case because of improper conduct of the county attorney."

We cannot see that the defendant was, in fact, prejudiced by these questions in view of the overwhelming evidence of guilt and the fact that only one-half of the maximum sentence was imposed. In a close case such conduct could be fatal, but this is not such a case. The record would have

1. Defendant: "A. Yes. And the only conversation with my brother in the car was the fact that I told him that Jim was in there—was there and had a gun and that I was going to try to get the gun away from him so we could fight.
Q. Your little brother didn't remember that though the next day, did he?

A. Well I don't know. He told me you threatened him with a few things, though.
Q. He told you what?
A. He told me that you made a few threats about filing charges on him if he didn't testify or something." (CM 168–169).

supported a much higher penalty or even the maximum of twenty years. We, therefore, find this proposition to be without merit.

■ The defendant next alleges that "the trial court committed reversible error by refusing to accept the first verdict rendered by the jury and in requiring the jury to return for further deliberations, although it was past the lunch hour and the jurors had not been served lunch at that time." The following transpired when the jury returned to the courtroom:

"The Court: Have you reached a verdict?

Mr. Corbit: Yes, sir. (Verdict handed to the Court)

The Court: Is this the verdict that's just been turned in here by you?

Mr. Corbit: Yes, sir; that's the one that was voted.

The Court: All right. Let the record show that the Jury has returned their verdict into court and that court is now in session. The defendant is present in court and by his attorney and the State is represented by Mr. Paul Carlile. Now, let me say to the Jury that I doubt that I can receive the verdict in this form and I will ask you to go back up in your Jury Room and look over the verdict. I'm not accepting it now and I think you will understand why.

The Court: Now, don't ask anything. Now, I don't know what you were going to ask but what did you start to say?

Mr. Corbit: I just wanted to ask you a question.

The Court: I don't have to answer it but go ahead and ask it.

Mr. Corbit: I just started to ask you if I could speak to you a moment in private to explain.

The Court: No, that would be a reversible error. Now, I'll ask you and I'm sure that you will understand—just go back up to your Jury Room and look at that verdict which I am not accepting. Just look at that verdict which you have

offered and which I am not accepting in its present form and I think that you will understand it if you will go back and look. So just go back up to your room.

Now, I'm going to say that at 1:00 o'clock regardless of the verdict—and this won't have anything to do with your verdict—that we're going to eat lunch after we get all through here. I tell you that to let you know that we aren't trying to starve you. So if you will, take that verdict back up to your Jury Room now.

(Whereupon, the Jury retired for further deliberations at the hour of approximately 12:45 p.m. this date and returned into open court at the hour of approximately 1:05 p.m. this date and the following proceedings were had and done:)

The Court: All right. Court is in session and let the record show that the District Attorney's office is represented by Mr. J. Fred Green and by Mr. Paul Carlile; that the defendant is present and by his attorney, Mr. Roy Frye, Jr., and that the Jury is in the box. Now, you are the Foreman?

Mr. Corbit: Yes, sir.

The Court: And your name is?

Mr. Corbit: Lester Corbit.

The Court: Lester Corbit?

Mr. Corbit: Yes, sir.

The Court: All right. Have you reached a verdict?

Mr. Corbit: Yes, sir."

The record does not reflect what was wrong with the original verdict, nor does it reflect the defendant objected to the Court's comments or actions in sending the jury back after refusing to accept the first verdict. It seems apparent from the Court's comments that there was a minor error in form which the jury could easily correct.

We are of the opinion that the trial court properly refused to accept an im-

proper verdict. Title 22 O.S. 1961, § 919 provides:

"If the jury render a verdict not in form, the court may, with proper instructions as to the law, direct them to reconsider it, and it cannot be recorded until it be rendered in some form from which it can be clearly understood what is the intent of the jury."

We feel that it is the better practice that courts should not set time limits for juries to deliberate. In the instant case there is no showing whatsoever that the jury was prejudiced by the court's actions. We, therefore, find this proposition to be without merit.

█ The defendant's next proposition alleges that the sentence imposed is excessive and is tantamount to a cruel and unusual punishment. The record reflects that the defendant, with obvious premeditation, shot Baty with a high-powered rifle while he was begging for his life. This Court has consistently held that we will not modify a sentence unless we can conscientiously say that the sentence is so excessive as to shock the conscience of the Court. See McCluskey v. State, Okl.Cr., 372 P.2d 623; Austin v. State, Okl.Cr., 278 P.2d 240; Ashton v. State, Okl.Cr., 478 P.2d 932. We, therefore, find this proposition to be without merit.

█ The defendant's final proposition asserts that the trial court committed reversible error by failing to instruct on good time credits. This is a novel allegation of error in that we have recently held that it is reversible error to give such an instruction. Nation v. State, Okl.Cr., 478 P.2d 974. This proposition is also without merit.

In conclusion, we observe the record is free of any error which would justify modification or reversal; the punishment imposed is well within the range provided by law, and for those reasons, the judgment and sentence appealed from is affirmed.

BRETT, P. J., and NIX, J., concur.