Wendell Vernon VAVRA, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A-17516.

Court of Criminal Appeals of Oklahoma.

May 2, 1973.

James C. Langley, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Jeff L. Hartmann, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

Appellant, Wendell Vernon Vavra, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Tulsa County, Case No. CRF–71–1842, for the crime of Murder, arising out of the death of one Meraldine C. Blackley. He was sentenced to serve a

term of life imprisonment in the State Penitentiary in accordance with the verdict of the jury, and a timely appeal has been perfected to this Court.

At the trial Earl Bullard testified for the State that on October 8 and 9, 1971, that he lived in apartment # 1 at 24½ East Fairview in Tulsa, Oklahoma; that he and one Betty Butler met the defendant on the way to the Western Union Office where the defendant received some money; and that the three returned to the Bullard apartment about midnight on October 8, 1971, where they met Louis Hogner, an Indian acquaintance of Bullard. The four of them began drinking wine, although Bullard was already intoxicated. Witness Bullard testified further that he had laid down and gone to sleep and sometime later he was awakened by loud noises. Thereafter, the defendant left his apartment and he could hear noises of someone breaking in the apartment above; Bullard went upstairs to find a man, dressed like the defendant in blue Levis, standing near the door of apartment # 5. Bullard said he told the man to stop breaking in and that the man then hit him and dragged him towards the upstairs porch and this was the last he remembered until waking up in the hospital.

Betty Butler next testified and her testimony was substantially the same as witness Bullard, except witness Butler testified that after a discussion about Indians, a fight ensued principally between the defendant and Hogner. She also testified that the defendant chased her into the street, hit her and then ran back into the apartment building. Witness Butler then ran to a neighbor's house and telephoned the police.

Mark Blackley, the deceased's thirteen year old son, next testified. Mark testified that on the night in question he was living with his mother in apartment # 5. He further testified that on the night in question he had been visiting a friend and returned home at approximately 1:00 or 1:30 a. m. and joined his mother, who was already asleep, in bed. He testified he was awakened about 2:30 a. m. by a crash at the living room door and then saw the defendant grab his mother, throw her down, kick her, then run out of the apartment. Mark and his mother fled down the front stairs but were chased back up the stairs by the defendant. Mark testified that the defendant caught his mother in the upstairs hall and she then told Mark to run and call the police. He ran back down the front stairs, jumped over Mr. Bullard's body, which was now lying on the front steps beneath the upstairs porch, and to a nearby house to call for help. On the way past apartment # 1, Mark saw Louis Hogner lying on the couch, apparently asleep.

Howard Gibbs Smith, II, testified he was visiting in upstairs apartment # 7 on the night in question and he heard scuffling and fighting in the upstairs hall accompanied by choking sounds. He saw an indistinguishable person dressed in blue Levis dragging someone in the hall about 1:15 a. m. Soon afterwards, Smith said the defendant kicked in the door to apartment # 7, said he was the FBI, threw the TV in the floor and a pair of TV rabbit ears at Smith, then ordered Smith to leave, which he did. While leaving, Smith saw a body in the upstairs hall.

Witness Leroy Flynn testified he lived in apartment # 6 upstairs and that a man kicked in his door early on October 9 and told him to leave his apartment, which he did.

Witness Frank McEniry testified he lived in apartment # 8 on the night in question and he heard a commotion in the hall early that morning and had his door kicked but not broken open. When he left his apartment, he had to step over a body lying in the hall.

Police Officer Larry Dale Raulston testified he was employed by the Tulsa Police Department on the night in question. Upon arriving at the apartment house at approximately 3:01 a. m., he and other officers observed Mr. Bullard's body lying on

the front steps and then went upstairs and found the deceased's nearly naked body lying in the hall; that the victim was bleeding from several wounds and had footprints and heel marks on her body. Two policemen subdued the defendant near the door to apartment # 6 upstairs after the defendant had jumped from behind a stove and tried to run past the officers. Louis Hogner was discovered by the officers lying on the couch in the Bullard apartment downstairs, apparently asleep. The defendant was led out of the apartment building, carefully around the blood covering the front steps, and to the Tulsa Police Station where his clothing was taken and placed in jail.

An FBI lab technician testified that human blood of an undetermined grouping was detected on the right shoe of the defendant.

Dr. Leo Lowbeer, a pathologist, testified that an autopsy revealed that the victim had died from extensive bruises and wounds compatible with being kicked or stomped.

The defendant testified in his own behalf that he had noticed his wallet was missing after his fight with Louis Hogner; that Hogner appeared and said that he and someone upstairs had the wallet and would kill the defendant if he tried to get it back. Defendant admitted kicking Hogner, running downstairs, breaking in some apartment and hitting someone there. The defendant then testified he went downstairs to get his jacket and fought Louis Hogner on the way. He then went back upstairs to find his wallet, saw body in the hall and again fought with Hogner, who stated that he had killed the woman because she would not split the money taken from defendant. After fighting three or four people through the hall, defendant said he then hid in one of the apartments because he was afraid.

The defendant first contends that it was error for the trial court to allow the State to endorse witnesses less than forty-eight hours prior to trial.

The following record was made concerning the endorsement of witness Frank McEniry:

"THE COURT: At this time the Court wishes to announce that at the conclusion of the previous hearing the Court then offered a 48-hour continuance to the defendant, which apparently counsel for the defendant, you desire not to take the 48-hour continuance and to proceed and that the Court will permit the endorsement of the witness Frank McEniry and that you wish to save an exception on the right of the State to ever call this witness but since they have been given the right, that you will proceed at this time without availing yourself of the continuance to prepare for the witness' testimony, is that correct?

"MR. DALTON: That is correct, Your Honor, and for the purpose of the record, for whatever it may be worth, we would demur to the evidence of the State with reference to the application to endorse the witness.

"THE COURT: Allowed—denied.

"MR. DUNN: For the record, may it also be shown the defendant at this time has not withdrawn his announcement of ready nor has he asked the Court for a continuance nor has he shown the Court in any way that he would be prejudiced by this witness being endorsed and being allowed to testify.

"THE COURT: The record shows silence on behalf of the defendant in that regard and the Court then directs the clerk to summon the jurors to prepare for trial." (Tr. 14–15)

In the case of Songer v. State, Okl.Cr., 464 P.2d 763 (1969) this Court held in Syllabus 1:

"If defendant's counsel is surprised by endorsement of an additional witness shortly before trial and such endorsement of an additional witness requires a production of further testimony by defendant, he should withdraw his announcement of ready for trial and should file a motion for a postponement or a

continuance in which he should set out the facts constituting such surprise, and the other evidence, if any, he could produce to rebut the testimony of such additional witness if the trial of the case was continued. Where he fails to do this the error, if any, is waived."

We therefore find the defendant waived any error by not accepting the 48-hour continuance offered to the defendant by the trial judge.

■ Later in the trial, the State sought to endorse witness Frank Vincent. The court overruled defendant's objection, finding that another witness had been inadvertently endorsed as the officer who had sent the clothing to the FBI lab.

In the case of McCollough v. State, Okl.Cr., 360 P.2d 727 (1961) this Court held in Syllabus 2:

"Permitting the endorsement of additional witnesses at the time of trial or just prior thereto is within the sound discretion of the court but that discretion should be exercised with the utmost precaution and only after a showing by the state as to their good faith and that non-compliance with the statute was not intentional but by virtue of *inadvertence or late discovery*." (Emphasis added)

The record reveals that witness Vincent was allowed to be endorsed by the State after the State had shown that another witness had inadvertently been endorsed. The record further reveals that defendant made no motion for continuance at this time nor a demonstration of material prejudice. We therefore find no merit in this proposition.

■ Under defendant's second proposition, the defendant contends the trial court erred in refusing to allow him to examine the jurors on voir dire individually rather than collectively.

In the case of Gonzales v. State, Okl.Cr., 388 P.2d 312 (1964) this Court held in Syllabus 3:

"The manner and extent of examination of jurors, touching their qualifications, cannot be prescribed by any definite, unyielding rule, but rests to a large extent in the sound discretion of the trial judge. In the examination, such latitude should be given the parties as will enable them to procure a jury free from outside influence, bias, or personal interest."

We therefore find that the trial court's denial of defendant's request that jurors be examined individually on voir dire outside the presence of other jurors was not an abuse of discretion. We therefore find no merit in defendant's second proposition.

■ Under defendant's third proposition he contends that the trial court erred in excusing for cause jurors who expressed an opposition to the death penalty.

In the case of Bumper v. North Carolina 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) the Supreme Court of the United States stated in that case the following:

"In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment. . . ."

In the instant case we note that the defendant did not receive the death penalty but was given a life sentence. We therefore find no merit in this proposition.

■ The defendant under his fourth proposition of error alleges that the trial court improperly denied defendant's request for a two-stage trial. In the case of Watts v. State, Okl.Cr., 487 P.2d 981 (1971) this Court held in Syllabus 9:

"Where the defendant is charged with a felony, first offense, and there is no statutory authority for a two-stage proceeding, the trial should be conducted in a one-stage proceeding."

**1384**

We therefore find no error in the trial court's refusing defendant's request for a two-stage trial.

■ The defendant under his fifth proposition asserts error when the prosecutor was allowed to summarize for the jury the nature of charge against defendant in the information during voir dire examination. The defendant cites no authority for this proposition. This Court in Sandefur v. State, Okl.Cr., 461 P.2d 954 (1969) stated:

"This Court has said many times:

'It is necessary for counsel for plaintiff in error not only to assert error, but to support his contentions by both argument and the citations of authorities. Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, this court will not search the books for authorities to support the mere assertion that the trial court has erred.'"

■ The defendant next urges error in allowing the State to present evidence of defendant's conduct while in custody after arrest at the police station. Specifically in the State's opening statement and later in Officer Wilkins' testimony, the jury heard a description of how the defendant hid behind the door of an interrogation room until seen by a police officer and there was some evidence of attempted flight from the scene of this crime. It is claimed that the evidence was irrelevant, introduced solely to inflame the jury, and admissible neither as a separate criminal act nor as part of the res gestae.

We note from the record the trial court gave the following instruction in regard to flight:

"You are instructed that evidence has been offered tending to show flight by the defendant shortly after the commission of the crime alleged against him in the information. If you find from the evidence that the defendant did at some time attempt to flee from the place of the commission of such alleged crime, and that such flight was induced by his apprehension of being charged with a public offense by reason thereof, this is a circumstance to be considered by you, in connection with all the other evidence, to aid you in determining the question of his guilt or innocence."

In the case of Ward v. State, Okl.Cr., 444 P.2d 255 (1968), this Court held in Syllabus 6:

"The question of flight is one of fact and not of law. Where the question is controverted, the court should not assume in its instruction that the defendant fled, but if instruction is given upon the question of flight, it should be submitted to the jury as a question of fact."

We therefore find no merit in this proposition.

■ The defendant next contends that he was prejudiced by being escorted from the courtroom by an armed, uniformed deputy in the presence of jurors. The record reveals that after a declaration of recess the defendant was escorted into the hall by a deputy; that the jury was present in the hall and the deputy held back the jurors and other spectators while he moved the defendant; that the deputy was in uniform and armed but used no handcuffs or actual physical restraints on the defendant.

We find no merit in this proposition. See Lott v. State, Okl.Cr., 491 P.2d 337 (1971).

■ The defendant's next proposition alleges that the trial court erred in denying defendant's motion to have juror Hatheway excused for cause. After the testimony of Bob Blackley, the deceased's former husband, juror Hatheway notified the court that he had seen the witness and his son, Mark, in the barber shop where Bob Blackley worked. Defendant contends that allowing the juror to remain on the panel after extensive questioning violated his right to an impartial jury in Article 2, paragraph 20, of the Oklahoma Constitution and 22 O.S.1971, paragraph 659, subsection 2.

In the case of Littrell v. State, 22 Okl. Cr. 1, 209 P. 184 (1922) this Court held in Syllabus B:

"Ordinarily, where a juror testified that he believes he can and the court finds as a matter of fact that he would, if selected, render an impartial verdict upon the evidence, he is an impartial juror, under our Constitution and the statutes of this state."

The record reveals over fifteen pages of examination of juror Hatheway after his statement to the court that he recognized the witness.

The questioning established that he had never spoken to either of the Blackleys, that he did not know their names, and that he had not heard them discuss the case. Although the juror initially answered he had sympathy for the witness and his son, which might cloud his attitude toward the case, the court ruled the juror remained qualified after his answers to more specific questioning such as the following:

"MR. WOODSON: Do you feel like that you can put this knowledge of who Mr. Blackley is, what he does for a living aside and sit and give us both a fair trial, Mr. Hatheway?

"JUROR HATHEWAY: Yes, I believe I can.

"MR. WOODSON: Do you feel like any sympathy that may come up in this case—I know the nature of the case may bring sympathy in all jurors—do you feel like you could put it aside just like any other juror would and judge it on the facts as they came to you from the witness stand?

"JUROR HATHEWAY: Yes, I believe I can. (Tr. 556–557)

\* \* \* \* \* \*

"MR. LANGLEY: When you retire to the jury room to deliberate will you put this out of your mind, this association, however tenuous?

"JUROR HATHEWAY: Yes.

."MR. LANGLEY: Will you be a cold and impartial juror, so to speak?

"JUROR HATHEWAY: Yes." (Tr. 561)

From the record in the instant case, we cannot say that the court abused his discretion in permitting juror Hatheway to serve as a juror.

�In The defendant next contends that he was denied a fair trial because certain pictures and evidence were in view of the jury without being admitted into evidence. We have carefully reviewed the cited portions of the record and find the trial court made the following statement:

"THE COURT: I will overrule the motion. It has not been admitted into evidence and we will have a hearing outside the presence of the jury before the exhibits are presented to the jury and the jury will not be permitted to view them until the Court has given authority, if the Court gives authority. So, be particularly careful, counsel, that you do not show any of the pictures in such a way that the jury could get even a fleeting glimpse of them." (Tr. 593)

The record reveals the trial court did not permit the jury to see the evidence until they were properly admitted in evidence.

▪ The defendant next alleges he was denied a fair trial by improper reference to the public defender's office by the prosecuting attorney during voir dire examination. Defendant cites Byrd v. State, Okl. Cr., 489 P.2d 516 (1971) in support. That case is clearly distinguishable on its face. There the State told the jury they were paying for the defendant's lawyer fees. The court held these remarks improper. Here the prosecutor asked the jury if any of them knew a witness who was working for the public defender's office. No mention was made of the fact that defendant was being represented by the public defender or that the jury was paying his fees through their taxes. Nothing in *Byrd*, supra, suggests that the mere mention of the public defender is error. We conclude that this proposition is without merit.

The defendant under proposition eleven contends that certain photographs of the

**1386**

deceased were improperly admitted into evidence on grounds that these photographs were inflammatory and prejudicial.

[■] The admissibility of a photograph into evidence in a criminal case is a matter addressed to the discretion of the trial court under circumstances of a particular case. McNutt v. State, Okl.Cr., 288 P.2d 418 (1955); Arnold v. State, Okl.Cr., 291 P.2d 1044 (1956).

■ When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence as an appropriate aid to the jury in applying the evidence, where the photograph relates to persons, things, or places. Robison v. State, Okl.Cr., 430 P.2d 814 (1967).

In the case of Revard v. State, Okl.Cr., 332 P.2d 967 (1958), certiorari denied, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030, wherein the defendant was charged with the beating and stomping death of his wife, this Court held in Syllabus 8:

"Where there is a question as to what caused the death of deceased, and there are many bruises over the body of the deceased shown to have been inflicted by defendant, photographs of body were admissible in evidence to illustrate or clarify the issue, where such photographs were shown to be faithful reproductions of what they purported to represent."

■ In the instant case the photographs depict the almost naked body of the deceased lying on her back with a badly battered face and blood very much in evidence. Witnesses testified that the photographs were faithful reproductions of the scene when officers arrived at the apartment house.

After carefully reviewing the record, we conclude that the photographs were relevant to certain issues before the court. They showed the location of the body in the hallway, as several witnesses had mentioned, they also showed the location, nature and extent of the victims wounds. The pathologist testified that death was caused by "shock due to loss of blood" which partially was caused by "innumerable bruises." The pictures illustrated the conclusions as to the cause of death by showing these bruises. We are therefore of the opinion that the facts in the instant case support the conclusion of the trial court, that the probative value of these photographs outweigh their prejudicial effect and were therefore admissible in evidence.

■ Under defendant's twelfth assignment of error, he urges that prejudicial error was committed when the State's attorney held up a pair of bloody pajama bottoms in view of the jury which had not been identified or admitted into evidence.

The record reflects that after both sides had rested, the trial court allowed the State to reopen for the purpose of admitting the pajama bottoms worn by the victim. In the case of O'Quinn v. State, Okl.Cr., 280 P.2d 759 (1955) this Court held in Syllabus 3:

"It is discretionary with the trial court to reopen the case for the purpose of introducing further evidence after both sides have closed; and unless a clear abuse of such discretion appears, no question is presented for review on appeal."

Dr. Lowbeer, a pathologist, testified extensively concerning facts indicating that the victim may have been sexually assaulted. Torn bloody pajama bottoms supported Dr. Lowbeer's testimony and were relevant evidence tending to show a possible motive for the crime in the form of a sexual assault upon the victim.

In the case of Brewer v. State, Okl.Cr., 414 P.2d 559 (1966) this Court held in Syllabus 8:

"Bloody clothing would be admissible, within the discretion of the trial court, to connect the accused with the crime, to prove the identity of the deceased, to show the nature of the wound, *or throw any relevant light on a material matter at issue.*" . . . (Emphasis added)

We further observe from the record that the defendant received a life sentence when the jury could have assessed the death penalty in this case. We therefore cannot say the defendant was prejudiced by this action as he received the minimum sentence for this crime.

 Under defendant's thirteenth proposition, he contends there was insufficient evidence to sustain a verdict of guilty.

In the case of Williams v. State, Okl.Cr., 373 P.2d 91 (1962) this Court held in Syllabus 2:

"Where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts."

The record in the instant case reveals sufficient competent evidence from which a jury could conclude that the defendant was guilty of the crime of murder. We therefore find no merit in this proposition.

 Defendant's proposition fourteen asserts error of the trial court in overruling defendant's objections to giving certain instructions and refusal to give defendant's requested instructions.

In the case of Richmond v. State, Okl. Cr., 456 P.2d 897 (1969) this Court held in Syllabus 6:

"Instructions, when considered as a whole, are sufficient if they fully and correctly state the law applicable to the case."

After a thorough review of the instructions given by the trial court, we find that they contained a fair, complete and accurate statement of the law. We therefore find no merit in this proposition.

 Under defendant's final proposition he contends that it was improper for the prosecutor to ask the defendant on cross-examination the following question:

"Q. Mr. Vavra, I will ask the question again, have you ever been convicted of any crime in any state, in any city or by any federal government law?" (Tr. 741)

In the case of Gilmore v. State, Okl.Cr., 365 P.2d 573 (1961), this Court held in Syllabus 2:

"Defendant, on appearing as witness, may be cross-examined concerning previous convictions for purpose of affecting credibility."

Also see 12 O.S.1971 § 381.

For the foregoing reasons, the judgment and sentence is, accordingly, affirmed.

BUSSEY and BRETT, JJ., concur.