**Rodney Allen GRABOW, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–74–716.**

Court of Criminal Appeals of Oklahoma.

Feb. 13, 1975.

As Corrected Feb. 14, 1975.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., for appellee.

Chad Bledsoe, Lawton, for appellant.

## OPINION

BUSSEY, Judge:

Appellant, Rodney Allen Grabow, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Comanche County, Case No. CRF–73–733, for the offense of Robbery by Means of Force or Fear, in violation of 21 O.S.1971, § 791. His punishment was fixed at a term of five (5) years imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness, Monika Roberts, testified that she was a resident of Lawton, Oklahoma, and that she had just returned from the store around 4:30 P.M. the afternoon of November 23, 1973. She stated that as she began to unload sacks of groceries from her car a man came up behind her with a gun, grabbed her arm, and made the statement, "give me your purse". She protested that she did not have a purse whereupon the man told her, "don't lie, I saw it," at which time he twisted her arm behind her back and pushed her into the house. Upon entering the kitchen, the man got into her purse and took thirteen (13) dollars and then asked her if she had any other money in the house. She said that she didn't and the man left her house, run-

ning in a westerly direction toward 67th Street. She testified that the only other persons present at the time of the robbery were her minor children, one of whom, a six-year old son, ran next door to get a neighbor when the robbery occurred. She related that she had an opportunity to see the man for at least a two-minute period and that she observed him during the course of the conversations referred to above. She then related the physical description of the man and his clothing. He was wearing a T-shirt, tan pants, and sunglasses. At this point of the trial, Mrs. Roberts made an in-court identification of this person pointing out the defendant, Rodney Allen Grabow, as the man who robbed her at gunpoint. She stated that after the man left her, she checked to make sure that her three children were safe and then immediately called the police.

On cross-examination, she testified that she was in fear for her life and for the lives of her children. She stated that when the police arrived, she gave them a physical description of the man who robbed her. Subsequent to the robbery, she attended a lineup at the Lawton Police Department conducted by Lieutenant Ball. Mrs. Roberts identified the defendant as the person who had robbed her. She was asked specifically the reason why she attended the lineup and her state of mind at that time. The pertinent part of her testimony as relates to this is as follows (Tr. 28):

"Q. You saw him for a minute in the kitchen. At other times he was behind you. Now, didn't you go down to this lineup at the Police Department subconsciously feeling that you had to identify somebody that did this to you?

A. No. I didn't. They asked me to come and view a lineup, and I did.

Q. Even though you were injured more emotionally than any other way, but even though you were injured in that respect—frightened a great deal, wouldn't you hate to see an innocent man go to prison for—

A. Yes, I most definitely would; that's why I didn't go down to the lineup thinking that I had to identify someone; I went down there to see if the man who robbed me was there, and he was, so I identified him, but had there been any doubt, I would not have.

Q. And didn't you select the one and only man that had any chance of meeting the description you had previously given to the police?

A. I selected the only man that was the one that robbed me."

The State's second witness, Rosa Rodriquez, testified that she lived at 6330 Northwest Taylor in Lawton, Oklahoma, and was at her home on the 23rd day of November, 1973. She stated that she first learned a robbery had taken place with Mrs. Roberts' little boy came running over to her house and said that a man had gotten his mother to give him money. She was on her way to Mrs. Roberts' house when she saw a person running from Mrs. Roberts' house toward a red car. She could not identify the defendant as that person but did give a description of the person she saw running from the house, similar to a description given by Mrs. Roberts. She further testified that the person she saw running from the house was the same person she had seen standing by the Roberts' garage as Mrs. Roberts was pulling in. She observed this person walk into Mrs. Roberts' house, heard a scream, and that is when she saw Mrs. Roberts' little boy running toward her house. All of this occurred around 4:30 P.M. of the afternoon in question. She also observed the man in question carrying a black object in his hand.

The defendant's first witness, Officer Frank Williams, testified that he was a detective for the Lawton Police Department. On November 23, 1973, he arrested the defendant pursuant to receiving a description

from his dispatcher concerning an attempted robbery of a lady at Cache Road Square and the robbery of Mrs. Roberts. The arrest took place at the east side of the Holiday Inn in Lawton, Oklahoma, at approximately 6:35 P.M., as the defendant and another man, John Deaton, were getting out of their car and walking up to an apartment complex. He testified that he advised both men of their Miranda rights. At this point, the man with the defendant broke and ran but was apprehended shortly by other officers arriving on the scene. He stated that the defendant did not attempt to run or give him trouble in any way.

On cross-examination, he testified that the other man with the defendant was a white male about six feet, five inches tall. He related that the description he received concerning the robbery of Mrs. Roberts was one Mexican male about six feet tall, one hundred sixty pounds and wearing light-colored pants.

The defendant's second witness was Officer Terry Ball of the Lawton Police Department. On November 24, 1973, he conducted two (2) lineups in which the defendant participated. After viewing a photograph of a lineup, he stated that it was the lineup connected with the robbery of Mrs. Roberts. At this point, the photograph was admitted into evidence over the objection of the District Attorney. Next, he was asked to identify a list of the subjects in the lineup which gave their names, ages, height, color of hair and eyes and weight. He identified the list as one that corresponded with the subjects in the photograph (Defendant's Exhibit No. 1). It was then admitted into evidence as Defendant's Exhibit No. 2. He further testified that Mrs. Roberts viewed this lineup and identified the defendant, in the number four position, as the man who robbed her. He stated that there were two (2) people, one of which was the defendant, in the lineup that had a darker skin complexion than the other three (3). Of these two, the one other than the defendant was about four (4) inches shorter than the defendant and had a mustache and Afro hair style.

On cross-examination, in reference to Defendant's Exhibit No. 1, he testified that he did not take the picture, he was not present when it was taken, it was taken from an angle different than that from which the witnesses viewed it and that it was of the same subjects in a different place under different lighting conditions. At this time, the State renewed their objection to its admission and this was sustained and the photograph withdrawn from evidence. He further testified that he could not find any other Mexican or Oriental subjects to participate in the lineup. He was with Mrs. Roberts when she identified the defendant and he stated that she showed no hesitation while doing so.

The defendant's third witness was PFC Jeff Nielson. He testified that on November 23, 1973, he lived in the same barracks on the Army Post in Lawton, Oklahoma, as the defendant. He went to the mess hall about 4:20 P.M. to eat and upon entering, he saw the defendant getting ready to leave. After eating, which took about ten minutes, he went to a friends room to listen to music. After being there approximately five minutes, the defendant and his friend came in. The defendant was wearing a pair of tan pants and while he was there, he borrowed a pair of blue Levis. He further testified that the defendant was wearing a pair of dark brown, ankle high, "Waffle Stomper" shoes. They all left the room around 5:00 P.M.

The defendant took the stand on his own behalf. He testified that he was an Intelligence Operators Assistant and had been at Fort Sill approximately twelve (12) months. On November 23, 1973, he stayed around the barracks watching T.V. or shooting pool. He ate dinner when the mess hall opened at 4:00 P.M. He was wearing a blue shirt, tan pants and "Waffle Stomper" shoes, a type of hiking shoe. He left the mess hall at approximately 4:20 P.M. to change his pants because he had spilled gravy on them. The portion of

testimony dealing with the time from 4:20 P.M. to 5:00 P.M. was substantially the same as that of Jeff Nielson. At 5:00 P. M., he went to his girl friend's house. They arrived about five minutes after five, as her apartment was right outside the gate. She was not home so he stayed and listened to music while Deaton went to see his girl friend, Mildred, at the doughnut shop where she worked. About 6:10 P. M., Deaton came back and they left to go to another friend's apartment, which was located on the east side of the Holiday Inn. He was not home but his neighbors told them he went to K–Mart. They went to the K–Mart parking lot and looked for his car but did not find it so they returned to his apartment where they were arrested. His testimony concerning the arrest was substantially the same as that of Officer Williams. He testified that during the line-ups conducted on November 24, 1973, the man with the mustache and Afro hair style was the only one in the lineup besides himself that was dark-complected. He stated that this nationality was Japanese. He further testified that he and his attorney traveled the routes connected with the instant case to determine the times involved. Travelling at the speed limit, it took thirteen (13) minutes to get from Mrs. Roberts' house, at 6328 Taylor Street, to his barracks, three (3) minutes from Cache Road Square to his girl friend's apartment, and four (4) minutes from her apartment to the Holiday Inn. He stated that he had never been to Taylor Street prior to this time.

For rebuttal, the State called Mildred Richardson. She testified that she lived at 3112 Cache Road. On November 23, 1973, she was employed at Wrights Doughnuts on Cache Road and went to work at 3:00 P.M. She stated that she knew John Deaton through a friend and was supposed to go out with him that night. She testified that John Deaton ,and the defendant came by the doughnut shop between 4:30 P.M. and 5:30 P.M. on November 23, 1973. Deaton came up to the window to talk to her while the defendant stayed in the car.

They came to see her twice in that time with only a few seconds between visits. She testified that she had met Deaton through her friend, Sandy Deck, the defendant's girl friend.

On cross-examination, she stated that she did not know where Deaton and the defendant went between the two times they stopped to see her. She testified that she wasn't exactly sure what time they stopped to see her and it could have been 5:30 P. M. or 6:30 P.M., but she didn't think it was that late. She further stated that the defendant gave her ten dollars at the time they came to see her for the purpose of buying some marijuana. She did not buy the marijuana and stated that she had not been smoking marijuana on the day in question.

For surrebuttal, the defendant called Sandy Deck. She testified that she went to see Mildred Richardson around 8:30 P. M. or 9:00 P.M. on November 23, 1973, to find out if she had seen the defendant that day as she was supposed to have a date with him that night. She stated that Mildred was high on marijuana at the time she saw her that evening. No further witnesses were called.

■ The defendant contends, as his sole proposition of error, that the trial court erred in removing from evidence Defendant's Exhibit No. 1, a photograph of a police lineup, after previously admitting same. He asserts that the said photograph did represent the police lineup which was witnessed by the victim and argues that the possibilities for selection having been narrowed to only one, based on the description offered by the victim, the photograph should have been presented to the jury, affording them the opportunity to determine if her selection of defendant could have been mistaken due to the influence of panic, fright and alarm. He claims that this denied him the right to present his full theory of defense which was based on alibi and mistaken identity.

The photograph in question was initially admitted during the testimony of Officer

Terry Ball, who stated that it was a picture of the lineup in which the defendant was identified (Tr. 66). Subsequent to this testimony, the defendant attempted to introduce the photograph into evidence, at which point it was objected to by the District Attorney. The prosecution attempted to ask qualifying questions of Officer Ball; however, their objections were overruled and the trial judge advised that the State could ask such questions on cross-examination. The trial court then admitted the photograph into evidence. During cross-examination, the following was revealed. Officer Ball did not take the photograph, nor did he see who took it. He was not present when the photograph was taken and testified that it did not reflect the angle from which the prosecuting witness would have viewed the subjects in the lineup. Further testimony revealed that the picture did not reflect the lineup as it was viewed by the victim, but rather, it depicted the same people in a different location and under different lighting. At this time, the State renewed its objection to the admissibility of the photograph and the Court, upon reconsideration of the issue, sustained the objection and the photograph was withdrawn from evidence.

With defendant's contention, we cannot agree. This Court has consistently stated that when a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence as an appropriate aid to the jury in applying the evidence, where the photograph relates to persons, things or places. See Vavra v. State, Okla.Cr., 509 P.2d 1379 (1973). In the same case, we also restated our position that the admissibility of a photograph into evidence in a criminal case is a matter addressed to the discretion of the trial court under circumstances of a particular case. From the record, it appears that the reliability of the photograph was in doubt and a matter to be left up to the discretion of the trial judge. We find no abuse of discretion by the trial court. In conclusion, we would also observe that all of the pertinent facts as they relate to the lineup were testified to by Officer Ball. Accordingly, we fail to see how the defendant was prejudiced by the exclusion of the photograph in question.

For all of the above and foregoing reasons, the judgment and sentence appealed from is affirmed.

BLISS, J., concurs.

BRETT, P. J., concurs in results.