Martin Emerson NOAH, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–220.

Court of Criminal Appeals of Oklahoma.

April 12, 1977.

Paul E. Blevins, Poplin & Blevens and William M. Thomas, Jr., Pryor, for appellant.

Larry Derryberry, Atty. Gen., Frank Muret, Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Judge:

Appellant Martin Emerson Noah, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Mayes County, Case No. CRF–75–224, of the offense of Murder in the First Degree, in violation of 21 O.S.Supp.1973, § 701.1. The sentence was fixed at death. From such judgment and sentence and death warrant, an automatic appeal has been perfected to this Court.

The State's case in chief revealed that on November 29, 1975, Mr. and Mrs. Melvin Rooker left Battle Creek, Michigan, in their 29 foot motor home. The deceased, Melvin Rooker, an amputee, having lost his right arm at an early age, had undergone open heart surgery two years earlier, from which he had never fully recovered. As a result of his heart condition, he and his wife decided to travel through the southern part of the United States to avoid cold weather which aggravated his heart condition. En route, they decided to go to Arlington, Texas, and they traveled through Illinois, spending the night in an out-of-the-way area near Wagoner, Illinois. Mr. Rooker, for security reasons loaded a rifle which he kept in the motor home. In Missouri, the Rookers picked up a hitchhiker, described by Mrs. Rooker as being a clean-cut individual and later identified as the defendant. The defendant, known to the Rookers as "Marty," told them that he had just recently been discharged from the service and that he was on his way to Texas to find work. Further, he related to them that

both his parents were deceased. The defendant appeared to be fatigued and slept in the back of the motor home the rest of the afternoon. At approximately 6:00 p. m. on November 30, 1975, the Rookers parked their motor home in a lot near a truck stop in Chouteau, Oklahoma. After supper the defendant and the deceased walked to the truck stop to drink coffee, and then returned to the motor home to watch television. The Rookers retired for the night while the defendant continued to watch television. Some time later the Rookers were awakened by a loud noise, but were told by the defendant that he had slammed the door after having stepped outside to smoke a cigarette. Mrs. Rooker remained awake and soon observed the defendant's head and arm extending around the end of the curtain which separated their bed from the rest of the motor home. She awakened her husband who upon checking his trousers found that his wallet was missing. The couple scrambled into their clothes, pulled the curtain and found the defendant pointing the deceased's rifle at them. Mr. Rooker declared, "Marty Why. We have been so good to you." The defendant replied with a grin. Mr. Rooker then warned the defendant that the rifle had a hair trigger, to which the defendant replied that the gun did not make much noise either. The defendant proceeded to remove money and identification cards from Mr. Rooker's wallet, and stuffed the money into his boot. The defendant ordered Mrs. Rooker to pin the curtains closed and to draw the shades. He further ordered her to empty the cupboards and demanded rope with which to tie the couple. Not finding any rope, the defendant instructed Mrs. Rooker to take a sheet off the bed, and with the aid of a kitchen knife he cut a strip which Mrs. Rooker was later ordered to use to tie her husband's left arm to his belt. The defendant took some of the deceased's heart medication, specifically the pain pills, from Mrs. Rooker, who noticed that some of the pills were already missing. The Rooker's pleaded with the defendant to leave them and to take the Volkswagen in tow behind the motor home, but defendant wanted the title

to the motor home, explaining that he did not wish to go to jail. He told them that he had a $125.00 a week heroin habit and had no means of support. The defendant demanded two apples and some liquor, which the Rookers carried in their motor home. As the defendant ripped the wires from the CB radio, Mrs. Rooker lunged toward the door but was blocked in her escape when the defendant grasped her by the neck. She attempted to escape again but the defendant struck her, causing her glasses to fall off. Following the second attempt to escape, the defendant moved her to the rear of the motor home and proceeded to tie her feet with a strip of the sheet. As he was tying her, Mr. Rooker lunged at the defendant and knocked him to the floor, and Mrs. Rooker crawled out the door and screamed for help. After she had gone some distance she looked back and saw her husband stagger out of the motor home, clutching his chest, bleeding profusely, and repeatedly saying, "I saved you." As he dropped to the ground she noticed a kitchen knife near his body.

After this episode several persons came to the aid of the Rookers from the truck stop. Russell Dikes stated that while he was present Mr. Rooker cried, "where are the police, that man stole $1,400.00 from me." An employee of the truck stop, Randall Grossman, related that when he came upon the scene, Mr. Rooker declared that "this guy had taken $1,400.00 of his money," and that, "the guy had stabbed him."

Considerable testimony and exhibits introduced at trial linked the defendant with the stabbing of Mr. Rooker. A suspect, later identified as the defendant, was apprehended approximately two miles from the truck stop. Blood stains apparent on his clothing were later typed as belonging to blood group A. Blood taken from the deceased was also typed as belonging to blood group A. At the time of the booking, an inventory of the defendant's personal belongings revealed $1,400.00 in his right sock. An insurance card found at the scene of the crime contained latent fingerprints,

later matched to those taken from the defendant.

Dr. Robert Bissell stated that his examination of the body of the deceased revealed 15 wounds, three of which were possibly fatal.

Dr. Bissell further testified that one wound penetrated the chest wall and that this wound was large enough to allow insertion of two fingers. He stated that the large wound was probably inflicted with a large sharp instrument, similar to a butcher knife.

The defendant introduced testimony by his father, Carl Noah, concerning his son's past history of problems related to drug abuse. The defendant testified in his own behalf and corroborated his father's testimony concerning his problem with drugs. He further corroborated essentially all of Mrs. Rooker's testimony as to the events of November 30, 1975, up to the time that he removed the wallet from Mr. Rooker's trousers, and pointed a gun at the Rookers. The defendant remembered Mr. Rooker's lunging at him and a commotion following. The next thing the defendant remembered was waking up in the Mayes County jail. The defendant stated that he had taken Valium and Darvon, which he had found in the motor home. He also drank several drinks containing liquor and smoked approximately seven marihuana cigarettes.

The defendant also introduced testimony by Dr. Wayne Boyd, psychiatrist. Dr. Boyd testified that he interviewed the defendant nearly one month after the incident, and found his personality to be antisocial. Moreover, the doctor stated that a person's ability would have been significantly impaired had he consumed the amount of drugs and alcohol which the defendant stated he had consumed.

In rebuttal, the State introduced testimony by Dr. Garcia, Chief Forensic Psychiatrist at Eastern State Hospital, who testified that he had examined the defendant on December 2, 1975, and his tests revealed no evidence of any confusion, mental disorder

or psychotic disorder. He stated that in his opinion one who had consumed the quantity of drugs and alcohol such as defendant stated he had consumed would have had a residual effect, lasting for several days. Dr. Garcia found no such residual effect in the defendant. He further stated that in his opinion, consumption of such a large quantity of drugs and alcohol, which defendant described, would have caused a state of total intoxication, i. e., a comatose state.

The defendant asserts as his first assignment of error that the trial court erred in overruling defendant's motion for continuance. The defendant contends that he was denied adequate private consultation with his attorneys prior to trial, and because of that denial they were unable to adequately prepare for trial. The defense does not state that they were never allowed to consult with defendant, only that they encountered some difficulty on weekends in obtaining private facilities to consult with the defendant due to the understaffed Sheriff's Office.

■ This Court has considered the issue of continuance on many occasions and has often held that a motion for continuance on the ground of want of time to prepare for trial is addressed to the sound discretion of the trial court, and the ruling of that court will not be disturbed on appeal unless an abuse of discretion is shown. See, *Hay v. State*, Okl.Cr., 447 P.2d 447 (1968). The record reveals that there were 66 working days prior to trial in which counsel for defense could have prepared, yet no request for a hearing on a motion for continuance was made until March 5, 1976, only three days before the trial was scheduled to begin. The defense asserts that its failure to seek judicial relief sooner was based on its reliance on the District Attorney's Office to correct the visitation problem. However, the burden was on the defense to diligently pursue a remedy to the alleged problem. Moreover, the defense does not demonstrate how it was prejudiced by difficulties encountered in attempting to consult with

defendant. The record indicates that the defendant received a fair trial and was represented by competent and well prepared counsel. See, *Helsper v. State,* Okl.Cr., 461 P.2d 971 (1969). Therefore, without a showing of prejudice, we cannot say that the trial court abused its discretion.

■ The second assignment of error asserted by defendant consists of three items of objectionable evidence admitted at trial. The defendant first contends that the trial court erred in admitting hearsay testimony under the guise of a dying declaration. The specific testimony to which defendant objects consists of statements alleged to have been made by the deceased, introduced by three witnesses, as follows:

"A. He said I saved you, I saved you.

\*　\*　\*　\*　\*　\*

"A. He said where are the police that man stole $1,400.00 from me.

\*　\*　\*　\*　\*　\*

"A. He said—Mr. Rooker said this guy had taken $1,400.00 of his money and I asked him if he had been stabbed and he said yes."

We need not consider whether the statements complained of met the exception to the hearsay rule of dying declarations since they did satisfy the res gestae exception. Moreover, the trial court admitted the statements under the res gestae exception, relying on *Hathcox v. State,* 94 Okl.Cr. 110, 230 P.2d 927 (1951). In that case this Court considered statements made by a mortally wounded policeman and discussed the fact that hearsay evidence may be admissible as part of the res gestae, where spontaneous statements or exclamations are made by the injured person. As stated in the Syllabus in *Hathcox v. State, supra:*

"1. The term 'Res Gestae' means matters incidental to the main fact and explanatory to it, including acts and words which are so closely connected therewith as to constitute a part of the transaction, and without a knowledge of which the main fact might not be properly understood; the events themselves speaking through the instinctive words and acts of the participants, the circumstances, facts and declarations growing out of the main fact, contemporaneous with it and serving to illustrate its character.

"2. Declarations, to be a part of the res gestae, need not be precisely coincident in point of time with the principal fact. If they spring out of it, shed light upon and tend to explain it, are voluntary and spontaneous, and are made at a time so near it as to preclude the idea of deliberation or fabrication, then they are to be regarded as contemporaneous, and are admissible as evidence."

Also see, *Porter v. State,* Okl.Cr., 487 P.2d 968 (1971).

Moreover, the fact that one of the statements made by the deceased was in answer to the question had he been stabbed, does not render it inadmissible. The Court in *Martin v. State,* Okl.Cr., 449 P.2d 275 (1969), considered the answering of questions by the injured party, and found that the questions answered were of very high importance in the case and were clearly admissible as part of the res gestae. Therefore, because of the shortness of time between the utterances and the infliction of the mortal wound, together with the fact that at the time the statements were made by the deceased, he was profusely bleeding and gasping for breath and from which he shortly succumbed, we believe the statements were properly admitted as part of the res gestae.

■ Secondly, the defendant asserts that the trial court erred in admitting a blood-stained strip of cloth into evidence. The deceased's wife testified that she was forced by the defendant to tie Mr. Rooker's hand to his belt with a piece of torn sheet.

In *Brewer v. State,* Okl.Cr., 414 P.2d 559 (1966), we reaffirmed the test as set forth in *Martin v. State,* 67 Okl.Cr. 390, 94 P.2d 270 (1939):

" 'It is permissible to introduce the bloody clothing when their introduction serves to

illustrate some point or solve some question or throw light upon some matter connected with the proper solution of the case. . . .' "

We further held in *Brewer v. State,* supra, that:

"Such evidence is admissible, within the discretion of the trial court, to connect the accused·with the crime, to prove the identity of the deceased, to show the nature of the wound, or to throw any relevant light on a material matter at issue. . . . "

■ The issue of relevance is discretionary with the trial court, and absent a showing of abuse of discretion the verdict will not be disturbed on appeal. See, *Jennings v. State,* Okl.Cr., 506 P.2d 931 (1973). In the case at bar the strip of cloth is corroborative demonstrative evidence tending to shed light on the defendant's alleged blackout, for the act of tying the deceased's hand to his belt was made in response to one calculating his method of robbery. Therefore, we find no error by the trial court in admitting the bloody cloth into evidence.

■ Thirdly, the defendant argues that the trial court erred in receiving into evidence colored slides of the body of the deceased taken subsequent to the homicide.

■ This Court has often stated that when a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence where the photograph relates to persons, places or things. Moreover, the admissibility of a photograph into evidence in a criminal case is a matter addressed to the discretion of the trial court under the circumstances of a particular case. See, *Vavra v. State,* Okl.Cr., 509 P.2d 1379 (1973), and *Grabow v. State,* Okl.Cr., 532 P.2d 68 (1975). In the instant case the photographs clearly had probative value which outweighed any prejudicial effect, since the photographs were taken prior to autopsy, and because there was some question regarding the health of the deceased which could have ultimately led to the cause of death. There

was also evidence of a gun and of a knife so as to leave open the question concerning the weapon used to inflict death. Therefore, the admission of the color slides was not error.

■ The defendant raises as his third assignment of error that the trial court erred by submitting improper verdict forms to the jury. The defendant states that the verdict for murder in the first degree was twice the length of the verdict form for manslaughter and for acquittal. The difference in size, defendant asserts, prejudiced the jury by emphasizing the form for murder in the first degree.

We find this assignment of error wholly without merit. The defendant fails to show how he was prejudiced by the variance in the size of the verdict forms. Furthermore, in the face of overwhelming evidence of guilt we fail to see how the defendant could have been prejudiced. This Court has generally held that where a verdict of guilty is clear a mere irregularity in form will not void it. See, *Turner v. State,* 27 Okl.Cr. 274, 226 P. 1064 (1924), and *Harvell v. State,* Okl.Cr., 479 P.2d 586 (1971).

■ As his fourth assignment of error, defendant contends that the trial court erred in overruling defendant's amended motion for new trial. Defendant states that the record contained approximately 40 gaps which deprived the defendant of a complete record on appeal, and thus the Court of Criminal Appeals cannot properly review the trial proceeding.

A careful examination of the record reveals that several gaps do exist in the transcript. The gaps generally appear at the points in the proceeding where the defendant made objections to testimony made by the prosecution's witnesses or to questions asked by the prosecutor. The conversations at the bench following the objections were usually not recorded by the court reporter. However, most gaps are followed by statements indicating whether the objection was sustained or overruled. In no instance was testimony omitted.

This Court has interpreted 20 O.S.Supp. 1972, § 106.4, to mean that the taking down of all testimony is not required in all instances. See, *Higgins v. State,* Okl.Cr., 506 P.2d 575 (1973), and *Byrd v. State,* Okl.Cr., 530 P.2d 1364 (1975). In the instant case, the omissions of defense counsel's conversations at the bench appear to have been because the conversations were out of hearing of the court reporter, and were not omitted under the direction of the trial court. Moreover, the defendant fails to allege any specific injury caused by these omissions, since no errors alleged by the defendant concern any part of the transcript not recorded. See, *Pollard v. State,* Okl.Cr., 528 P.2d 1121 (1974). Indeed, the transcript is quite voluminous, containing motions, motion hearings, the preliminary examination, and the trial, as well as a transcript recorded after the trial in which the trial court and the attorneys attempted to recreate the omitted conversations at the bench. Clearly, the defendant was not denied the benefit of a complete transcript since the record is sufficient to protect the defendant against another prosecution for the same offense. See, *Crowell v. State,* 6 Okl.Cr. 148, 117 P. 883 (1911). Therefore, we find this proposition to be without merit.

▆ The defendant urges in his final assignment of error that this Court may impose only an indeterminate sentence of ten (10) years to life in the State penitentiary under the provisions of 21 O.S.Supp.1973, § 701.2, because the decision in *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976), is not controlling in this case. The defendant argues that since 21 O.S.Supp.1973, § 701.5 and § 701.6, had been rendered inoperative in *Williams v. State,* Okl.Cr., 542 P.2d 554 (1975), at the time of the instant trial, the *Riggs* case cannot properly be applied to the instant case since it revives Section 701.5 and Section 701.6 to impose a life sentence in a capital case following the invalidating of the Oklahoma death penalty.

We find this argument to be without merit. The express language in *Riggs v. Branch,* supra, makes that decision binding on all penalties imposed before July 24, 1976:

"[W]e conclude that this Court is vested with the proper modification power under § 701.6, supra, and that the alternative sentence which may be imposed against *those individuals convicted of murder in the first degree prior to the effective date of our new murder homicide statute* is life imprisonment." (Emphasis added) 554 P.2d at 829.

Furthermore, in *Dean v. Crisp,* Okl.Cr., 536 P.2d 961 (1975), this Court held that if a statute is repealed by a subsequent legislative act and that subsequent act is declared unconstitutional, such declaration renders the repealing act invalid and reinstates the former act. Similarly, in the *Riggs* case we determined that the decision in the *Williams* case, declaring Section 701.5 and Section 701.6 unconstitutional, was premised upon an erroneous supposition. Therefore, the statutes were revived and considered never effectively stricken. Consequently, the *Riggs* case is controlling in the instant case.

For all the reasons set out above and from a consideration of the record as a whole, we find that there was no error and that the defendant received a fair and impartial trial. However, in light of the decision in *Riggs v. Branch,* supra, the sentence imposed must be modified to life imprisonment in the State penitentiary at hard labor, and otherwise *AFFIRMED* as *MODIFIED.*

BUSSEY, P. J., and BLISS, J., concur.