**Wayne WHITELEY, Individually, and Wayne Whiteley, d/b/a Whiteley L.P. Gas, Plaintiff-Appellee,**

v.

**OKC CORP., Defendant-Appellant.**

**No. 81–2249.**

United States Court of Appeals, Tenth Circuit.

Oct. 19, 1983.

**BARRETT**, Circuit Judge.

Defendant OKC Corporation (OKC) appeals from a judgment of the district court awarding plaintiff Wayne Whiteley damages in the amount of $151,700.00 on claims that OKC breached express and implied warranties of merchantability, 12A O.S. §§ 2–313, 314, and fitness for a particular purpose, 12A O.S. § 2–315. Whiteley had alleged damages, both business and personal, for these violations pursuant to the Uniform Commercial Code as adopted by Oklahoma. Whiteley, d/b/a Whiteley L.P. Gas, originally sought damages in the amount of $65,000.00, and Whiteley, individually, originally sought damages in the amount of $50,000.00 for personal injuries suffered. Whiteley subsequently amended his complaint to increase the amount of his claim to $75,000.00 for business damages and to $250,000.00 for personal damages with an additional claim for punitive damages totalling $1,000.000.00.

Whiteley commenced this action in federal district court, pursuant to 28 U.S.C. § 1332, against OKC as the result of an accident that occurred in December of 1978 at Whiteley's storage yard. Whiteley, an Oklahoma resident, is engaged in the retail sale of liquid propane gas to customers in three rural Oklahoma counties. Whiteley purchases the propane from Home Petroleum Company (Home) and Home then assigns Whiteley to a refinery with available propane—OKC in this case. Whiteley then takes delivery of the propane by driving his personal transport truck to the OKC refinery for filling.

On December 14, 1978, Whiteley accepted delivery of approximately 10,000 gallons of propane from the OKC Refinery. He transported the gas back to his storage yard where it remained in his truck for the next two days. On the morning of December 16, 1978, one of Whiteley's customers came to the yard to complain about the presence of moisture in some propane purchased from Whiteley. The presence of moisture in propane is a potentially dangerous problem that concerns all who are associated with the gas. Whiteley drove the customer

Jim Ikard, Oklahoma City, Okl., for plaintiff-appellee.

Ronald N. Ricketts of Gable, Gotwals, Rubin, Fox, Johnson & Baker, Tulsa, Okl., for defendant-appellant.

Before McWILLIAMS, BARRETT, and McKAY, Circuit Judges.

across the yard to the transport truck which contained the propane accepted from OKC on December 14. Whiteley determined to show the customer the nature of the problem—water-filled propane loads from the OKC Refinery.

Whiteley, while kneeling under the body of the truck with a container in his hands to catch any liquid, opened a "belly" valve underneath the truck's tank to allow any moisture to run out.[1] When Whiteley opened the valve, a large amount of liquid poured out, striking the bottom of the container and knocking it from his hands. As a result, Whiteley was drenched with the liquid from his knees to his face. Extensive testimony later revealed this liquid to be hydrofluoric acid.[2] After feeling a strong burning sensation, Whiteley disrobed, jumped into his pickup truck, and drove across the yard back to his house.

After showering off and soaking in cold bath water, Whiteley's skin turned red and eventually blistered. Whiteley testified that at this time he was experiencing "unbearable" pain. (T.Vol. VII, p. 72). Whiteley then went to the emergency room of a nearby medical clinic, received medical treatment by the physician on duty, and was released at his own request with instructions to return two days later. Whiteley returned to the clinic in two days where his burns were re-dressed, his eye (which was irritated from the splashing liquid) was checked, and he was prescribed further medication.

On direct examination, Katie Whiteley, Wayne's wife, testified that, despite the medication use, her husband remained in constant pain. (T.Vol. VII, p. 142). In addition, his skin began turning darker. Whiteley therefore went to a specialized burn center in Tulsa, Oklahoma. There, to prevent the risk of gangrene, the doctors performed a procedure called "debride-

ment" on Whiteley's legs. This procedure involves surgically cutting off damaged (dead) skin from a patient's body and thoroughly cleansing the area. Whiteley testified about the extreme pain he endured during this procedure, (T.Vol. VII, p. 76), and for two to three weeks thereafter. (T.Vol. VII, pp. 78, 103–04). Whiteley further testified about the pain he experienced from his burned hands, and how his fingernails, after being eaten away by the acid, took nine to ten months to grow back. (T.Vol. VII, pp. 78–79).

Other testimony by Whiteley revealed that he was unable to return to his "normal life" without pain until approximately five months after the accident. (T.Vol. VII, p. 83). His legs are now discolored, which embarrasses him to wear shorts or a swimming suit in public. (T.Vol. VII, pp. 79–80). Notwithstanding Whiteley's pain and suffering, our review of the entire record discloses that there was no evidence that Whiteley sustained any permanent disability, nor did he present any expert testimony regarding either his personal injuries or the nature of the damaging liquid.

On appeal, OKC raises several issues: (1) Whether the damages awarded were so plainly excessive as to suggest passion and prejudice on the part of the jury; (2) whether the trial judge committed error by admitting evidence of the financial condition of OKC over the defendant's objection; (3) whether the trial judge committed error by admitting evidence of an accident that occurred at OKC's refinery approximately twenty months after the incident in question; and (4) whether the jurors mistakenly believed that they could award punitive damages.

## I.

OKC's primary contention on appeal is that the jury award was overly excessive.

---

1. Apparently, this is a routine process to check for unwanted moisture. The heavier water will run out into the container while the lighter propane gas remains in the tank. (T.Vol. VII, pp. 59–60).

2. Hydrofluoric acid (HF) is defined as a "clear, colorless, fuming corrosive liquid or gas." Once HF comes in contact with the skin, it "produces severe skin burns which are slow in healing." Sax, *Dangerous Properties of Industrial Materials* 729 (5th ed. 1979).

OKC raises several possible causes for the alleged excessiveness of the award, one of which we now consider. OKC contends that evidence concerning its financial condition was improperly admitted by the district court, and, thus, contributed to the grossly excessive verdict. At oral argument, Whiteley strenuously argued that OKC "opened the door" to allow this evidence to be admitted. We agree with Whiteley.

 As a general rule, it is error to admit evidence of a party's financial condition unless necessary to determine the damages sustained. *Blankenship v. Rowntree*, 219 F.2d 597, 598 (10th Cir.1955). To admit financial condition evidence, the damages to be determined must be punitive in nature. *Id.; Smith v. United States Gypsum Co.*, 612 P.2d 251, 255 (Okl.1980); 22 Am.Jur.2d *Damages* § 322 (1965). Additionally, this inadmissible evidence includes that of the *poverty* of a party. 22 Am.Jur.2d *Damages* § 319 (1965). Here, the trial judge determined punitive damages not to be recoverable. Therefore, any evidence of OKC's financial condition should have been inadmissible. However, the record shows that, on direct examination, an employee of OKC testified about the present status of the Corporation—it had been liquidated and was proceeding in bankruptcy. (T.Vol. VII, pp. 171–76). We must now decide whether OKC "opened the door" to cross-examination by Whiteley concerning its financial condition. We hold that it did.

> The recognized rule in this Circuit is that: [I]f a party interjects into a case incompetent evidence tending to establish immaterial or unrelated facts, he cannot complain on appeal that his adversary subsequently offered and was permitted to introduce the same kind of evidence

.... even though under other circumstances the testimony [elicited by the adversary party] would be inadmissible. A party, having himself opened the door to evidence which is inadmissible ... cannot complain that thereafter the court in the exercise of its sound judicial discretion permitted the opposite party to introduce other testimony bearing upon the field of inquiry, even though under different circumstances the testimony would be subject to valid objection of inadmissibility.

*United States v. Regents of New Mexico School of Mines*, 185 F.2d 389, 391 (10th Cir.1950). *See also United States v. Bessesen*, 445 F.2d 463, 470 (7th Cir.1971), *cert. denied*, 404 U.S. 984, 92 S.Ct. 448, 30 L.Ed.2d 368 (1971); *United States v. Lowe*, 234 F.2d 919, 922 (3d Cir.1956); 1 J. Wigmore, *Evidence* § 15 (3d ed. 1940).

 The introduction of evidence by OKC concerning its current corporate status was clearly trial strategy to show its impecunity, intended to mitigate damages. After a careful review of the record, we hold that OKC did "open the door" to this subject matter, which allowed Whiteley to cross-examine the witness to contradict the evidence of OKC's "poor boy" status.[3] We refuse to reverse a lower court decision on appeal when the appellant complains of possible error which he himself induced. *See Sanders v. Buchanan*, 407 F.2d 161, 163 (10th Cir.1969). The admission of rebuttal evidence rests within the sound discretion of the trial court. *United States v. Posey*, 647 F.2d 1048, 1052 (10th Cir.1981); *United States v. Smurthwaite*, 590 F.2d 889, 891 (10th Cir.1979). We do not find any abuse of discretion by the trial court.

## II.

Next, OKC contends that certain evidence concerning a subsequent accident at

---

**3.** The transcript of the cross-examination is as follows:

Q All right. Now, with regard to that, when the OKC Corporation decided to quit doing business, what were its general assets?

MR. RICKETTS: Judge, I will object.

THE COURT: Go ahead, you may answer.

A I really don't know.

Q (Mr. Ikard) Well, what, $50 million, $5 million?

A No, more than that. I'm trying to remember. I was concerned with the refinery, naturally. But I really don't recall. They did have other assets, considerably other assets.

Q Well, in fact, what did Basin pay or offer to pay to the trust for the refinery?

A $115 million.

Q $115 million?

A Yes.

(T.Vol. VII, pp. 186–87).

its yard was improperly admitted. OKC argues that this evidence was both irrelevant and hearsay. OKC again urges that this evidence was a cause of the excessive verdict. The alleged "evidence" in question was introduced to the jury by Whiteley at opening statement,[4] on direct examination,[5] and on redirect examination on recall of Mr. J.D. Sewell.[6]

### a. *Relevancy*

OKC contends that the remoteness in time of the subsequent accident renders evidence of it irrelevant, and any probative value it may have was substantially outweighed by the danger of unfair prejudice. Thus, OKC urges that this evidence be declared inadmissible pursuant to Fed. Rules of Evid. 401 and 402, 28 U.S.C.A., or alternatively, Fed. Rules of Evid. 403, 28 U.S. C.A.[7] Sewell, a propane distributor just as Whiteley, was receiving propane gas from OKC. His testimony established that on August 18, 1980, approximately twenty months after the Whiteley accident, one of his transport trucks was involved in an acci-

**4.** The transcript of that portion of the opening statement is as follows: In fact, Mr. "Red" Sewell from Okmulgee will testify that in August of 1980, one of his folks went to OKC Refinery and before it could get from the loading dock to the weigh scale—

MR. RICKETTS: Excuse me, could we approach the bench, please?

THE COURT: Yes.

(Whereupon a conference was had at the side bar out of the hearing of the Court Reporter and jury.)

THE COURT: The objection is made that August of 1980 is so remote from the incident complained of that it could not have any possible probative value by you.

Let me tell you, the jury, that opening statements are not evidence, you will not decide the case based upon what lawyers say, you will base it upon what witnesses say. And I then rule as to whether such evidence is admissible. Go ahead.

MR. IKARD: And before it could get to the scale, it began to smoke. The truck, as many of these are, was actually fueled by propane, as well, and the hoses began to disintegrate, the driver jumped out, and it sat there and it had 700 pounds of hydrofluoric acid in it. And it was emptied and the truck was virtually destroyed.

(T.Vol. VII, pp. 43–44).

**5.** The transcript of the direct examination of Mr. J.D. Sewell is as follows:

Q Okay. Tell us what happened on August 18, 1980?

A I had a driver at the plant loading product, somewhere another he got some contaminated product of some sort, and how it got there, I don't know, I'm sure they didn't, but it was there. And the driver got from the loading rack almost to the scales.

Q How far was that?

A Oh, 200 yards.

MR. RICKETTS: Excuse me, may we approach the bench?

(Whereupon, a conference was had at the bench out of the hearing of the Court Reporter and jury.)

THE COURT: ... this objection is sustained, Mr. Ikard is going to tell through this witness only what he saw and then the gentleman back here, I understand, is an eyewitness to it, the objection being that it was hearsay ....

(T.Vol. VII, pp. 112–13).

**6.** The transcript of the redirect examination is as follows:

Q Okay. With regard to this thing that happened in August of 1980, again I think it's August 18, 1980, who specifically do you recall told you that what had happened to your truck is it had hydrofluoric acid in it?

A Well, it's just more or less common to say that that's what it is around the plant.

Q Do you recall anybody by name who told you?

A Well, to call a man's name I would have to go and find out. I don't know the man's name.

Q All right. And how much hydrofluoric acid did they tell you you had in your transport?

A There again hearsay, because I was not there.

Q I understand that.

A I was not there at the time.

Q What did they tell you?

A They said somewhere around six, 700 pounds extra, so I don't know.

Q 700 pounds of hydrofluoric acid?

A I couldn't swear to it. All I can say is hearsay.

Q That's what you were told?

A Right.

(T.Vol. VII, p. 165).

**7.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

dent at the OKC yard. (T.Vol. VII, pp. 112–15). Sewell also testified about specific instances of a continuing problem he has had with OKC propane damaging his equipment both prior and subsequent to Whiteley's accident, including at the time of trial. (T.Vol. VII, pp. 108, 111).

The determination of whether evidence is relevant is within the sound discretion of the trial court, and that decision will not be disturbed on appeal absent a showing of a clear abuse of discretion. *Texas Eastern Transmission Corp. v. Marine Office-Appleton & Cox Corp.,* 579 F.2d 561, 566 (10th Cir.1978); *Noah v. State,* 562 P.2d 950, 955 (Okl.1977). Even if determined to be relevant, the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. We have said that the trial court must "balance" the probative value of the evidence with the danger of prejudice, and that we will not disturb that decision absent an abuse of discretion. *Texas Eastern, supra,* at 567.

We are unable to find an abuse of discretion by the trial court. We cannot say that the trial court erred by finding the subsequent accident not to be too "remote" to be relevant. The evidence presented sufficiently linked the numerous OKC sales of adulterated gas. As noted, those sales occurred both prior and subsequent to the Whiteley accident. Also, the balance of Sewell's testimony, combined with the testimony from other plaintiff witnesses regarding continuing problems with adulterated gas,[8] reveals that evidence of this subsequent accident was not prejudicial to OKC.

#### b. *Hearsay*

OKC also contends that this evidence of the subsequent accident was hearsay.[9] Ultimately, OKC urges that Sewell's testimony about the accident was hearsay because any statement made to him by an agent of OKC, which is reiterated by Sewell at trial, is inadmissible as hearsay when the agent is unidentifiable by name.[10] This argument has no merit.

The record is clear that OKC made no objection to the admissibility of Sewell's testimony on recall. Normally, where no objection is made at trial to the admissibility of evidence, the issue is not preserved on appeal unless there was plain error involved which affects the substantial rights of a party. Fed.R.Evid. 103(a) and (d). No plain error existed because Sewell's testimony on recall concerning statements made to him by an agent of OKC was not hearsay and, thus, was admissible pursuant to Fed. Rules of Evid. 801(d)(2)(D), 28 U.S.C.A.

### III.

As noted above, OKC primarily contends that the district court erred by denying its motion for a new trial on the ground that the verdict was excessive. OKC urges that several factors plainly show that the jury acted on prejudice or passion.[11] In light of our earlier holding that the financial condi-

---

8. *See* Transcript, Vol. VII, at pp. 116, 126–31, 154–57.

9. Defendant-Appellant OKC makes a statement in its initial appellate brief that is clearly at error. OKC argues that after a hearsay objection to Sewell's testimony was sustained (T.Vol. VII, p. 113), the trial court then, at a later time, ignored the hearsay ruling and allowed the testimony (T.Vol. VII, p. 165). *See* Brief of Defendant-Appellant OKC Corp. at 10. The first objection that was sustained concerned Sewell's testimony of what *his own* agent had told him about the accident. This is clearly hearsay without any recognized exception since Sewell *is not a party to this action.* However, the subsequent testimony by Sewell regarded statements made to him by an *agent of OKC,* a *party* to this action.

10. *See supra* note 6 for the text of this testimony.

11. Brief of Defendant-Appellant OKC Corp. at 1:

Plaintiff's injuries consisted of superficial burns which (1) required no hospitalization; (2) caused no permanent disability; (3) resulted in no loss of income or earning capacity; (4) caused no permanent pain and suffering; and which exceeded the original prayer of $50,-000.00 for personal injuries by nearly three times.

tion evidence and the subsequent accident evidence were properly admitted, we need now consider whether this evidence caused the jury's verdict to be excessive.

 Fed. Rules of Civ.Pro. 59, 28 U.S.C.A. governs the granting or denial of a motion for a new trial in diversity actions in federal court. State procedure does not apply. *Holmes v. Wack,* 464 F.2d 86, 88 (10th Cir.1972) (citing 6A *Moore's Federal Practice* Para. 59.05). The trial court must determine whether the judgment for damages is excessive and, thus, whether a remittitur or, if refused by the plaintiff, whether a new trial is necessary. *Holmes, supra,* at 89. The trial court denied OKC's motion and ruled that the verdict was not excessive.

 We have held that the federal trial judge has broad discretion whether to grant a motion for new trial. The decision will not be disturbed on appeal absent a gross abuse of discretion. *Garrick v. City and County of Denver,* 652 F.2d 969, 971 (10th Cir.1981); *Holmes, supra,* at 89. When reviewing the district court's use of its discretion regarding excessive verdict claims, we must determine whether the award was "so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial . . . ." *Garrick, supra,* at 971–72 (quoting *Barnes v. Smith,* 305 F.2d 226, 228 (10th Cir.1962)). Although we can reverse the verdict if it is too far out of line, there must be a strong showing of an abuse of discretion. *See* 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2820 (1973).

 Under Oklahoma law, each case with an excessive verdict issue must be reviewed upon its own facts and circumstances. *Hitchcock v. Weddle,* 304 F.2d 735, 737 (10th Cir.1962) (citing *Oklahoma Ry. Co. v. Strong,* 204 Okl. 42, 226 P.2d 950 (1951); *Jones v. Eppler,* 266 P.2d 451 (Okl.1953); *St. Louis-San Francisco Ry. Co. v. Fox,* 359 P.2d 710 (Okl.1961)). In *Hitchcock,* we noted that this Circuit and Oklahoma courts

have held that the jury's verdict need be supported only by any evidence tending to sustain it. *Hitchcock, supra.* As the reviewing court, we must view the evidence in the light most favorable to the prevailing party. *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.,* 571 F.2d 1144, 1149 (10th Cir.1978), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978).

 In reviewing the record on appeal, we observe that the determination of damages is traditionally a jury function. *Rosen v. LTV Recreational Development, Inc.,* 569 F.2d 1117, 1123 (10th Cir.1978). This is so because the jury has heard the evidence first hand and has observed the demeanor of the witnesses. The jury must have much discretion to fix the damages deemed proper to fairly compensate the plaintiff. *Missouri-Kansas-Texas R.R. Co. v. Miller,* 486 P.2d 630, 639 (Okl.1971).

 With these rules in mind, we hold that we are not shocked by the size of the verdict awarded. We do not believe that a sufficient showing has been made that the jury acted out of passion or prejudice. We do not agree with OKC that the subsequent accident evidence and the financial condition evidence caused the jury to act prejudicially or with passion. As previously observed, the jury was presented with substantial other evidence of continuing problems that several distributors incurred with OKC's propane. In addition, the jury could have used the financial condition evidence presented by Whiteley to "balance" against the evidence of liquidation and bankruptcy introduced by OKC.

 Beyond this, OKC contends that the jury was possibly mistaken about its prerogative to return an award for punitive damages, in that after the court had orally informed the jury at the trial's beginning of the jury's power to assess punitive damages, the court, after ruling that punitive damages were not awardable, failed to instruct the jury that no punitive damages could be awarded. *See* Brief of Defendant-Appellant OKC at 28–29. This contention is without merit.

The trial court properly instructed the jury regarding the damages it could return. *See* Instr. No. 5, R. pp. 50–51. OKC did not request any instruction to explain the punitive damage ruling, nor did it object to the instructions given. In the absence of any exception to the instructions given, we will presume that all issues were submitted to the jury under proper instructions. 5 Am. Jur.2d *Appeal and Error* § 892 (1962). Further, we will not impute to a jury the inability to understand correctly the total instructions of the trial court; nor will we impute nonfeasance, by disregard of a court's instructions, to a jury. *Rasmussen, supra.*

WE AFFIRM.