Mary E. MASSIE, Plaintiff Appellee
and Cross Appellant,

v.

GODFATHER'S PIZZA, INC.,
Defendant Appellant and
Cross Appellee.

Nos. 86–1080, 86–1150.

United States Court of Appeals,
Tenth Circuit.

April 14, 1988.

Lowell V. Smith, Hanson, Dunn, Epperson & Smith, Salt Lake City, Utah, for Godfather's Pizza, Inc.

Edward B. Havas (W. Brent Wilcox, with him on the brief), Giaque & Williams, Salt Lake City, Utah, for Mary Massie.

Before SEYMOUR and BALDOCK, Circuit Judges, and BROWN, Senior District Judge.[*]

WESLEY E. BROWN, Senior District Judge.

Mary Massie brought this negligence action against her former employer, Godfather's Pizza, claiming damages for a rape and assault she sustained during a robbery of a Godfather's Pizza restaurant in Salt Lake City, Utah, on October 5th–6th, 1983. She claimed that she was injured because of the negligence of Godfather's and its employee, James Head, who failed to comply with the demands of the robbers, contrary to company policy.

The jury returned a special verdict in favor of plaintiff for $200,000 in general damages, and an additional $36,000 in special damages. After trial the court sustained defendant's motion for remittitur, and reduced the special damage award to $10,000.

Both parties appeal from the judgment—the defendant upon various grounds, including the absence of negligence, and upon the argument that worker's compensation is plaintiff's exclusive remedy—while plaintiff appeals the trial court's action in reducing the jury award of special damages from $36,000 to $10,000.

The issues on appeal are whether or not the trial court properly denied Godfather's Motion for Judgment Notwithstanding the Verdict, whether the trial court erred in denying Godfather's Motion for New Trial, and whether the jury's damage awards were appropriate and supported by substantial evidence. In the appeal, Godfather's claims that state worker's compensation is plaintiff's exclusive remedy; that neither Godfather's Pizza nor its employees owed a duty to comply with the demands of the robbers; that the policy of Godfather's Pizza to comply with the demands of robbers did not impose a duty on its employees; that any alleged negligence on the part of Godfather's was not the proximate cause of plaintiff's injuries; that plaintiff's counsel's plea for punitive damages in his closing argument was prejudicial, and that his incorrect statement of law concerning the "coming and going rule" was prejudicial, so that a new trial is required; and finally, that the general and special damages awarded to plaintiff were excessive.

Our review of the record discloses that the evidence, viewed in the light most favorable to the plaintiff, entitled the jury to make the following findings of fact:

Plaintiff was employed by defendant Godfather's at its restaurant located at 2100 South 900 East, Salt Lake City, Utah through October 5, 1983. She worked as minimum wage "counter help", taking orders, cleaning tables and running the cash register. She had no supervisory responsibility at work and she had nothing to do with the safe that was in a back room at the restaurant. Her uniform consisted of navy blue pants, a blue and tan striped pullover shirt, and while working, an apron, hat and name tag. Neither the shirt nor the pants had the Godfather's name or logo on them.

James Head, originally hired as a cook and a dishwasher, was made a shift supervisor for Godfather's in May, 1983, at which time his wage was raised from the minimum wage of $3.35 per hour to $3.50

[*] The Honorable Wesley E. Brown, Senior District Judge, District of Kansas, sitting by designation.

per hour. As a shift supervisor, Head was considered a part of the management team, who was to have a thorough working knowledge of company policies and procedures. He had all of the keys to the restaurant and he possessed the combination and key to the safe located on the premises. Management personnel, including the shift supervisor, wore a vest and tie, which signified their special position of authority.[1]

Prior to October 5, 1981, Head had been a shift supervisor for approximately six months but had not yet learned how to close out the books at the end of the evening shift.

According to Head's job description in the company manual, he was required to "maintain positive community relations at all times, *both on and off* the job", and he was expected "even when he was off the clock" to be representing Godfather's Pizza. (Tr. 435–436).

Carl Satchell was the manager of the Godfather's restaurant in October, 1983. He had not previously checked into Head's prior employment or Army background, and he testified that prior to October 5th, Head had "acted macho and cocky" during working hours.[2] Satchell also knew that on one occasion, Head had brought a gun that was wrapped up and concealed on the Godfather premises.

Prior to October 5, 1983, plaintiff knew that there was a safe in the employee break room, and she had requested Head to get change for her on several occasions. She assumed that Head had access to the safe, although she had never actually seen him open it.

Godfather's usually closed at 11:00 p.m., but on October 5, 1983, the restaurant became busy late in the evening, causing the shift to run later than usual. Plaintiff, who was scheduled to work until closing, did not have a car at work that day. Although her husband usually picked her up

after work, plaintiff made arrangements to walk home with Head after work that day, so her husband would not have to get their small son out of bed at that time of the night to come and pick her up. Plaintiff had walked home from work on many prior occasions, but not after dark.

After the last customers were served, plaintiff, Head, and Carl Satchell began cleaning up and preparing to leave. Satchell left about midnight, leaving plaintiff and Head still at work. Prior to leaving, Satchell asked plaintiff to estimate when she would finish her work so he could fill out her time card. She estimated another half hour, so Satchell "clocked her out" at 12:30 a.m. In fact, plaintiff did not complete her work in that time, and worked another 45 minutes or so beyond the time noted on her card. Plaintiff was not paid for the extra time.

While cleaning up, plaintiff observed someone pull on the locked door of the restaurant, but she did not see the individual well enough to identify him. The restaurant did not have "open" or "closed" signs on the door, and it was not unusual for people to walk by to see if the place was still open.

After their work was done, Head and plaintiff played a video game and then left the restaurant, Head locking the door behind them. They did not observe anyone around the restaurant when they left. At the time they left the store, plaintiff was wearing her dark slacks and striped shirt, covered by a long navy seater coat. Her apron was rolled up and put in her pocket, and her hat and name tag had been left at the restaurant. Head had removed his tie and wore a black jacket or vest over his clothes.

About two blocks from the restaurant they were accosted by two men, who ordered them to go back to the restaurant to get money. Head noticed that one of them had a knife in one of his pockets. Head

---

1. As shift supervisor, Head was required to "Maintain a thorough working knowledge of and follow all company policies and procedures", according to the company manual, and Carl Satchell, the manager of the restaurant.

2. Head had been released from the Army "for the good of the service", because he had gone "AWOL".

agreed to cooperate and they walked back to the store, but Head told one of the men that he could not open the safe, although he had the knowledge and ability to do so. Head knew that there was only $500 in the safe.

On the way back, the men checked Head's wallet and asked plaintiff for her money. She had only a nickel which the men did not take. At the store, the men took Head's keys and made plaintiff unlock the restaurant. All four went in, and the men locked the door after them and kept Head's keys.

Head led plaintiff and the men around to check the tills, which were empty, and into the break room. Head and one of the men went on to the manager's office for a search for money, and then Head's hands were tied and he was returned to the break room. There, one of the men began manipulating the safe, trying to open it; Head again was asked to open the safe, but he again denied that he could do so. The men became frustrated and disgusted at their inability to get any money. One man made a statement to the effect that "if we can't get any money, we're going to get some pussy." The jury was entitled to find that this statement was made in the break room in Head's presence.[3]

One of the men then took plaintiff to a different part of the restaurant, forced her to undress and raped and sodomized her. Then, the second man did likewise. During this, Head heard Mary crying and screaming. After the second assault on plaintiff began, Head finally agreed to open the safe, but not until the first man went to Head, zipped up his pants in front of him, and threatened him with a roll of cellophane wrap. After getting the money, the two men left on foot, taking plaintiff with them, and leaving Head tied up in the restaurant. Plaintiff was forced to run down an alley and over an eight foot fence, injuring her foot and both hands. She was able to escape when a policeman came into view. The men separated and ran; they were never caught.

Head told the robbers that he could not open the safe because he felt that, as a representative of Godfather's, he was left in charge of it and it was his responsibility. He told an investigator that he didn't want to lose his job, and didn't want Godfather's to lose any money.

Prior to the incident involving plaintiff, Godfather's had formulated a written policy which called for immediate compliance and cooperation in the event of a robbery. The company Manual set out procedures to be followed: (Appellant Exhibit C, Plaintiff's Brief):

"No amount of money is worth the safety and well being of Godfather's Pizza employees. The criminal is usually interested only in money and, if not provoked to any other violence, will 'take the money and run.' The real key to safety of the victim is to allow the criminal to get in and get out as quickly as possible. "Godfather's Pizza, in cooperation with law enforcement agencies, has established the following standard procedures in the event of a hold up or robbery.
* Above all, remain calm.
* Do not create a *hostile* situation.
* Do exactly what the criminal tells you.
* Do not provoke the criminal.
* Offer no resistance.

\* \* \* \* \* \*

"Above all, cooperate. Do not try to overcome the criminal. Do not resist. Do exactly what the criminal says."

When making bank deposits, Satchell had discussed with Head that he should comply with robber's demands, but he did not review the written policy with Head. Godfather's had no organized training program with regard to employee conduct during a robbery, and the robbery policy was not posted in the restaurant. The Company Manual was kept in the locked manager's office and was not generally available to employees. Head testified that he had received no training whatsoever regarding robbery, and he was not aware of Godfather's written policies.

**3.** Plaintiff so testified. Head denied that he     heard the statement made.

The two men made all of their demands and efforts to Head to get money, not to the plaintiff. Prior to the one man's statement that if they could not get money they would attack plaintiff, there had been no indication that the men intended a sexual assault of any sort.

Two experts testified to the effect that Head's response to the robbery, and Godfather's methods of hiring and training its personnel, were substandard. Both of these experts also established proximate cause, testifying that if Head had reacted properly and turned over the money, the robbers probably would have taken the money and left, without harming plaintiff.

Prior to the assault, plaintiff enjoyed life, enjoyed dealing with the public, was outgoing and had a good marriage with a satisfying sex life. Since this incident, her marriage has suffered, her sex life has been significantly impaired, and she feels frightened, threatened, and insecure. She obtained psychiatric and emotional counseling from several professionals. At the time of trial, she was being seen by Dr. Victor Cline, whom she had seen about six times. Dr. Cline diagnosed plaintiff as suffering from post-traumatic rape syndrome, from which she will never recover. This doctor testified that the memories of the assault were permanently etched into her recollection by a chemical produced in high stress situations, locking vivid memories in place to recur from time to time. Dr. Cline and plaintiff planned future appointments, which would become less frequent when progress was made, or more frequent, in time of stress. The doctor's usual charge for counseling was $75 per hour at time of trial.

Plaintiff has tried to return to restaurant work, but gave up one job when they wanted her to work nights. She is afraid to walk past "scruffy looking" men, and will cross the street to avoid them. At the time of trial she was employed cleaning houses for two or three hours a day.

In her complaint, plaintiff alleged that the response of the shift supervisor, James Head, was negligent, for which Godfather's was responsible under the principle of *respondeat superior*, and that Godfather's was directly negligent in the manner of hiring, screening, and failing to train its supervisory-management personnel. Godfather's denied the allegations, and raised the affirmative defense that worker's compensation was plaintiff's exclusive remedy, and that Godfather's had no separate duty to plaintiff, and that its negligence, if any, was not the proximate cause of injury and damage to plaintiff.

Prior to trial, Godfather's moved for summary judgment dismissing the action on the ground that the worker's compensation law was the sole and exclusive remedy, and upon the issue of proximate cause. The district court denied this motion, ruling that there were genuine contested issues of material fact involved in the case which precluded summary judgment as a matter of law.

The case was submitted to the jury upon a general theory of negligence, and upon instructions which covered Godfather's affirmative defense based upon workmen's compensation. The jury was instructed that in order for the plaintiff to prevail, she was required to prove three propositions.[4]

"1. That the defendant Godfather's Pizza, Inc. was negligent in that either, (a), Godfather's failed or omitted to give adequate training, supervision and education to James Head as to appropriate measures he should have taken in the event of a robbery; and/or (b), that James Head failed to act as a reasonably prudent person should have acted during the course of the robbery and at a time when he was acting in the scope of his employment for Godfather's.

"2. That the negligence of the defendant in either or both of the particulars that I've just referred to was a proximate cause of the incident to the plaintiff.

"3. That as a result of said incident, she suffered injuries and damages."

Godfather's affirmative defenses were submitted under these instructions:

---

**4.** The Court's Instructions appear at pp. 501 et seq. of the Transcript, Record, Vol. III.

"Additionally, defendant asserts certain affirmative defenses which it must prove by a preponderance of the evidence and which are as follows:

1. At the time of the incident, the plaintiff was an employee of defendant acting within the course or scope of her employment and that the assault upon her arose as a result of her employment.

2. That plaintiff was negligent in her conduct prior to the incident in question and that such negligence proximately caused or contributed to cause her own injuries and damages.

3. That the plaintiff failed to mitigate her damages."

The trial court provided the jury with a lengthy and detailed definition of "negligence" as it pertained to the case before them:

"Negligence is the failure to exercise due care under the circumstances. The degree of care required increases in proportion to the risk of harm which is known or under the circumstances ought to be known to exist."

"Negligence may be the doing of some act which a reasonable and prudent person would not do under the same or similar circumstances, or it may be the failure to do something that such a person would have done under the same or similar circumstances. The mere fact that an incident happened, considered alone, does not support an inference that any party to this action was negligent."

"You'll note that the person whose conduct we set up as the standard is not the extraordinarily cautious individual nor the exceptionally skillful one, but a person of reasonable and ordinary prudence. While exceptional caution and skill are to be admired and encouraged, the law doesn't demand them as a general standard of conduct."

"In determining whether plaintiff Mary Massie or James Head was negligent, you should consider the following: A person who, without negligence on their part, is suddenly and unexpectedly confronted with peril arising from either the actual presence or the appearance of imminent danger to themselves or to others is not expected nor required to use the same judgment and prudence that may be required of them in calmer and more deliberate moments. In such a situation their duty is to exercise only the degree of care which an ordinary prudent person would exercise under the same or similar circumstances. If, at that moment, they exercise such care, they do all the law requires of them, even though, in light of after events, it might appear that a different choice and manner of action may have been better or safer."

The scope of Godfather's liability under the principle of *respondeat superior*, was set out for the jury in this manner:

"The defendant ... is liable for the negligent acts of its employee, James Head, provided such acts were done within the course and scope of his employment. In determining whether or not James Head's conduct at the time of the incident was within the course and scope of his employment for this purpose, you should consider whether or not the conduct was of the kind he was employed to perform, whether or not the conduct occurred substantially within time and space limits, and what extent, if any, the conduct was motivated by a purpose to serve the employer."

As to the issues of proximate cause and intervening cause, the jury was instructed that an intervening cause "is one which actively operates to produce harm and occurs after the purported negligent act ... and which was not foreseeable to the defendant." It was explained that even though the injury was the result of criminal conduct by third parties, such conduct could be a proximate cause, if the criminal conduct was itself "foreseeable to the defendant". The court instructed that:

"Foreseeable means to know or reasonably anticipate beforehand. Thus, you should determine, in the case of the defendant ... whether it was negligent, and if so, whether at that time, as a reasonably prudent corporation, it should have reasonably anticipated or foreseen that a criminal assault generally of the

same kind as occurred here could have occurred as a result of its negligence. And the same thing as to James Head. If you find that he was negligent and acting in the scope of his employment at the time, you should then determine whether, at that time, as a reasonably prudent person, James Head should have reasonably anticipated or foreseen that a criminal assault, generally of the same kind that occurred here, could have occurred as a result of his negligence."

The issue of the applicability of the workmen's compensation law was presented for jury determination in this manner:

"The defendant has asserted as an affirmative defense in this case that the plaintiff's injuries arose out of or in the course of her employment with defendant. It has the burden of proving this by a preponderance of the evidence. If you find such claim to be true, plaintiff is barred in this action from any recovery against the defendant because of the Worker's Compensation Act. In making this determination as to whether the incident arose out of or was within the scope of plaintiff's employment with defendant, you should focus on the factual situation and plaintiff's relationship thereto as it existed at the time of the incident. In determining whether plaintiff was in the course of her employment at the time, you need not find that she was doing a particular task which constituted her main duties. Rather, you should focus on whether her injuries suffered in such incident may be said to arise out of or in the course of her employment, and that such incident resulted from a risk reasonably incident to her employment."

After deliberation, the jury returned a special verdict making these specific findings:

1. Godfather's Pizza and/or James Head while acting within the scope of his employment, was negligent;

2. That such negligence was a proximate cause of plaintiff's injury;

3. That plaintiff was not negligent;

4. That the negligence of Godfather's—James Head was 100%;

5. That at the time of the incident in question, plaintiff was *not* acting within the course and scope of her employment with defendant;

6. That plaintiff's special damages were in the sum of $36,000 and that her general damages were in the sum of $200,000, for total damages of $236,000; and

7. That plaintiff did not fail to mitigate her damages.

On appeal, Godfather's contends that plaintiff's action must fail because of the exclusive remedy provisions of the Utah Worker's Compensation Act which provide that an employee is entitled to the benefits of the Act, and the employer is entitled to the protection of the Act, "if the injury arises out of or in the course of his employment." U.C.A. Sec. 35-1-45. Defendant cites and discusses cases from various jurisdictions which have held that a sexual assault committed upon an employee is a compensable injury under worker's compensation acts.[5] In particular, defendant relies on a Nebraska case which it believes to be factually similar to the situation now before us. In *P.A.M. v. Quad L. Associates*, 221 Neb. 642, 380 N.W.2d 243 (1986) two female employees of Wendy's were accosted in the parking lot as they left work at 1:30 a.m. One of the employees handed over bank deposit bags which she was carrying. The women were then taken back in to the restaurant and raped. The Nebraska court found that the claims of both women against their employer were barred by the exclusive remedy provisions of the state worker's compensation act. The court found that the claim of the assistant manager who was carrying the bank bags was obviously barred because she was in the process of making a deposit for her employer. As to the second woman, who merely had been waiting for a ride with the manager, the court found that

5. Cases are collected in Annotation 52 A.L.R. 4th 731. Cases collected in an annotation appearing at 49 A.L.R. 4th 926 are those in which it appears that assaults arose out of and in the course of employment.

while she was not engaged in any specific task for her employer, she was injured while on the premises of her employer and while leaving her employment—a situation "traditionally and consistently" held to be "an injury arising out of and in the course of one's employment," under Nebraska state law.

Other courts have held that when the assault against an employee was due to motives unrelated to the employment, the injury did not arise out of the employment situation. Thus, where an office employee was raped on the employer's premises by a janitor while she was walking to lunch, the court in *Tolbert v. Martin Marietta Corp.* (1985 D.C.Colo.) 621 F.Supp. 1099 held that the injury did not arise out of the employment because the assault was not associated with the employment.[6] In denying the employer's motion for summary judgment based upon the claim that the Workmen's Compensation Act provided the exclusive remedy, the court discussed the circumstances in this manner: (621 F.Supp. pp. 1102–1103)

> "Thus it is clear that the rape was neither distinctly associated with her employment, nor personal to her. It was a non-employment motivated act of wanton brutality directed at the plaintiff because she was a women. There is nothing to indicate that any other woman—whether or not a Martin employee—who happened to be in the same area at the time of the attack would not have become the victim ... It is clear that she was not raped because of the nature of her duties or the nature of her workplace environment, nor because of any incident or quarrel growing out of the work."

■ Our review of the record establishes that the facts surrounding plaintiff's employment situation at the time of the assault presented a classic jury question, and that question was properly submitted to the jury.

Defendant next contends that if plaintiff was not within an employment situation,

then in effect, it had no duty at all toward plaintiff since no duty is imposed in law upon a proprietor of a business establishment to comply with a demand of a robber. This precise argument was presented to—and rejected by—the trial court at the close of plaintiff's evidence, (Tr. pp. 359–360) and the case was submitted to the jury upon general principles of common law negligence, which required an element of "foreseeable harm."

■ Under Utah law, Godfather's had a duty to act reasonably under the circumstances. In Utah, the possessor of land may be liable when harm is caused by the negligent or intentional acts of third parties, if the landowner failed to exercise reasonable care to discover that such acts were being, or were likely to be done. *Pagan v. Thrift City, Incorporated*, 23 Utah 2d 207, 460 P.2d 832, 834 (1969). The rule applies, even though criminal conduct by third persons is involved, if such conduct is foreseeable. *Mitchell v. Pearson Enterprises*, 697 P.2d 240 (Utah 1985).

In *Pagan*, the Utah rule was stated in this manner, 460 P.2d at 834:

> "A possessor of land who holds it open to the public for business purposes is subject to liability for injuries to members of the public where harm is caused by negligent or intentional acts of third persons provided the possessor of the land failed to exercise reasonable care to discover that such acts are being done or likely to be done, or to give a warning adequate to enable visitors to avoid harm."

■ The trial court ruled, and the evidence established, that Godfather's had recognized foreseeable harm, and created its own duty to the public when it established its written "robbery policy," quoted above. There was no error in the submission of the question to the jury, under the instructions of the court which are quoted above.

■ Defendant contends that any alleged negligence on its part was not a

---

**6.** The employer filed an appeal in the *Tolbert* case, and the Court of Appeals certified a question of state law to the Supreme Court of Colorado. The case is still pending before the Colorado court.

proximate cause of plaintiff's injuries, because there was no evidence that Head would have acted any differently had he received formal "robbery training"—and because there was "no evidence" that this particular rape would not have occurred even if Head had immediately opened the safe. Defendant has ignored the testimony of plaintiff's expert witnesses who described the formal training required to insure that an employee's reaction to a robbery situation would be automatic—and the testimony of both expert witnesses to the effect that in their opinion the sexual assault on plaintiff would not have occurred if Head had opened the safe promptly. A jury question existed, and the issue was properly submitted for determination.

■ Defendant contends that plaintiff's counsel improperly made a plea for punitive damages in his closing argument and that a new trial should be ordered due to the prejudicial nature of this remark.

In discussing the amount of a damage award, counsel made this argument: (Tr. 474–475)

> "(Plaintiff) has become scared. She is afraid of life. Before she was secure about it. She loved to deal with the public. Now, she isn't. What is that worth? That's going to call upon your collected wisdoms. I could tell you it is worth $600,000 dollars, tell you it is worth a hundred thousand, tell you it is worth a million. I don't know. You read in the paper about verdicts nowadays go all kinds of numbers, into the millions, into the hundreds of thousands. I don't know. I have my own feeling about what it is worth, but I think you've got to make up your own mind.
>
> "But I think you have got to do this. I think you have got to make it enough that it is a statement of what's happened to her. And so that companies who are—
>
> "THE COURT: Mr. Wilcox, it is compensatory damages, not punishment.
>
> "MR. WILCOX: I understand. That a company who has young people working in late night jobs, giving them responsibility involving money and security, that

they have an up-to-date, adequate training, security system to protect anyone who comes in contact with that system.

> "I'm going to ask you for that, for a verdict that will fairly compensate her and I think you will have no problem in finding the elements of negligence. If that negligence caused, probably caused the assault upon Mary, and that has resulted in a very substantial injury to her. Thank you."

Following a conference at the bench, the trial court immediately instructed the jury in the following manner: (Tr. p. 475).

> "Members of the jury, apropos of Mr. Wilcox's argument, I don't want to interrupt counsel, but I'm going to instruct you on damages later on, but I want you to understand now, that if you award damages in this case, it is compensation to Ms. Massie for what she suffered and what she went through, and as will be described more definitively later in my instructions. *But any amount that you award is not punishment to Godfather's or to Head or anybody else. The damages in this case will be to compensate Ms. Massie.*" (Emphasis supplied).

When counsel's statement is viewed in its entirety, and in the context of the entire proceeding, including the court's prompt reminder and instruction to the jury that there was to be no punitive aspect to the jury's award of damages, we find that there was no error in the court's refusal to order new trial on account of the remark in question.

Defendant next contends that plaintiff's counsel's incorrect statement of law concerning a "coming and going rule" requires new trial.

Plaintiff submitted a jury instruction regarding the "coming and going" rule, which stated:

> "... an injury arises out of or in the course of employment only when it occurs while the employee is performing a task on behalf of her employer, or is engaged in some activity so connected with her employment that it is an essential aspect of the employment. Injuries

sustained by an employee while the employee is going home after work are generally not deemed to have arisen out of or in the course of employment."

The court declined to give this specific instruction because it might tend to confuse the jury. The court felt it was important not to tell the jury things in a negative form:[7] (Tr. p. 424)

"I think the average juror and average person would assume that somebody that isn't in the work place isn't working. So, I don't think it is that critical. I think it is important to tell them what they have got to find and not to tell them things that really don't apply."

During closing argument, plaintiff's counsel referred to the "coming and going" rule in the following manner, after defense counsel had argued that if James Head had been acting within the scope of his employment at the time in question—then plaintiff likewise must have been within the scope of her employment at the same time: (Tr. pp. 494–495).

"Now, Mr. Smith indicated to you that the test here of whether it is in the scope and course of the employment is the same both for Head and for Mary Massie. That isn't true. The Court will instruct you that Godfather's is liable for Head's individual acts if he is acting within the scope and course of his job as the management team. He was. He had the keys. He was in charge of things. This whole thing arose out of him not giving the money. Clearly within that scope.

"But the test is totally different for her. The Workmen's Comp laws in this state forbid you to sue the employer—your employer unless, for example, you are going away from work or you are coming to work. You are not covered during that period. And the only time you cannot sue your employer is when you are involved in your own employment. The Court will instruct you about

that, that it has to be: Did this incident arise out of her employment?

"Now, she had clocked out, left the premises was walking down the street. There is no different (sic) than if she had gone home and James Head was sitting in her living room and two guys came in and said: We're taking you back to Godfather's. C'mon, whoever is with you is going back, too. And she happens to just have been an employee there during her working hours. They go back to the store, Head refuses to open the safe and she gets raped.

\*     \*     \*     \*     \*     \*

"These situations are no different than here. She was off the clock, not involved in her employment. The only reason Mary got raped, as I said before, she happened to be a female that was with James Head when he refused to do what he was supposed to do."

The defendant objected to the reference to the "coming and going" rule because plaintiff's counsel did not discuss the exceptions to that rule, or give any other elaboration. Defendant suggested that an additional instruction be given on the rule. The court declined to give any further instructions in that regard.

Defendant then moved for new trial because of the reference to the "coming and going" rule. The trial court ruled that while plaintiff's counsel erred in stating that a person is not covered when "going away from work", that such error was not prejudicial and did not affect the substantial rights of the parties, when the remark was considered in the context of the entire case and the instructions which were given.

As noted by the trial court, the instructions that were given told the jury that in determining whether the incident arose out of or was within the scope of plaintiff's employment, the jury should focus on the factual situation and plaintiff's relationship

---

7. The "coming and going" exclusion rule is subject to certain exceptions—i.e., when transportation is furnished by the employer; where employee is using a required vehicle, etc. In Utah, the question of whether the injury arises out of or within the scope of employment *"depends upon the particular facts of each case."* (Emphasis supplied) *State Tax Commission v. Industrial Commission of Utah,* 685 P.2d 1051, 1053 (Utah 1984).

to those facts. The jury was also told that in determining whether plaintiff was in such scope she didn't have to be actually doing her duties, and the jury should focus on whether her injuries resulted from a risk reasonably incident to her employment. It is to be noted that the jury was also told that the statements and arguments of counsel were not evidence, and that the jury was to follow the law as stated in the instructions. Finally, the trial court noted that the "coming or going" rule was really not the focus of the case: (Vol. I Record, Item 73, pp. 5–6)

"Finally, and of some significance is that the major focus of both parties at the trial was not on the 'coming or going' rule, but was rather on whether the assault arose out of or in the course of her employment in that it resulted from a risk reasonably incident to her employment. Plaintiff argued and some evidence supported the claim that her employment had no causal relationship to the assault and that she would have been treated no differently had she not been employed by defendant, but had met Head ... on the street just prior to them being accosted. Defendant argued and some evidence supported the contrary claim that the assailants had observed plaintiff and Head inside the premises before they left and that the only reason both were accosted and returned was because of their employment. While it certainly had some relevance to this dispute that she was not actually on defendant's premises when accosted, that subject was not the factual area on this subject principally contested by the parties. Accordingly, and while the statement was erroneous its effect, in the opinion of the court was not sufficiently significant to prejudice the defendant's rights and to warrant retrial of the case."

■ Following our review of the record, and considering counsel's comment in the context of the whole case, including all of the instructions given by the court, we find that the denial of new trial because of the "coming and going" reference was not an abuse of the trial court's discretion.

■ Finally, defendant suggests that the award of $200,000 in general damages was excessive, in view of the fact that plaintiff claimed "no physical injuries" as a result of the rape, and the sprained foot and "a few, superficial abrasions" had healed without incident. Defendant believes that this amount was awarded by the jury "in an attempt to punish Godfather's", and as an example to others, rather than an award to compensate plaintiff. The evidence establishes that the assaults were brutal, inflicting continuing distress and permanent emotional injury to plaintiff.

The jury's own conduct shows that the verdict was arrived at by careful consideration, for the jury communicated with the court regarding the award of general damages, expressing concern about whether or not its award would be changed: (Appellate Exhibit D–2)

"If General Damages are awarded and is judged to be too high will it be changed by the judge P.S. or to how will it be changed ... are there any guide lines for this award.

The trial court replied in writing as follows: (Appellate Exhibit D–3)

"Dear Jurors:

The determination as to the amount of general damages to be awarded is *your* decision and not *mine*. It will not be changed by me.

The "guidelines" are general ones and are contained in the instructions relating to damages and specifically in paragraphs 2 and 3 (unnumbered) on instruction 17 which specifically relates to general damages." (Emphasis of the court).

In this instance, as in most cases, the question of appropriate damages was a matter particularly within the discretion of the jury. *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1058 (10th Cir.1983). Under the facts of this case, the amount awarded was not shocking or outrageous, and there is no evidence whatsoever that the award was intended to be punitive in nature. The verdict as to general damages must stand.

■ Plaintiff contends that the trial court abused its discretion in ordering a

remittitur on the special damage award. The jury sent a separate written inquiry concerning medical damages: (Appellate Exhibit E–1)

"When awarded money for med care if all money is not used by plaintiff what happens to rest of money"

The court's answer in this instance was as follows: (Appellate Exhibit E–2)

"Dear Jurors:

Any amount that you award to the plaintiff as special or general damages would be hers and to the extent it is in excess of her obligation for medical services."

At the time of trial, plaintiff's medical expenses consisted of a hospital bill for $98.00, and about six sessions with Dr. Cline at $75 per session, for a total of approximately $550 for past medical expenses. There was no direct evidence as to expenses to be incurred for future counseling sessions, although Dr. Cline believed that plaintiff would require counseling for the rest of her life. In view of the imprecise nature of evidence concerning future medical expenses, we can not find that the trial court abused its discretion in ordering a reduction of the special damage award.

For all of the foregoing reasons, the Judgment is AFFIRMED.