**F I L E D**

**UNITED STATES COURT OF APPEALS**

**AUG 4 1998**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LUIS RAMIREZ-PIÑON,

Defendant - Appellant.

No. 97-2374
(D. Ct. No. CR-97-184-JP)
(D. N. Mex.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **BALDOCK**, and **KELLY**, Circuit Judges.

After a jury trial, the defendant was convicted of bringing aliens into the

United States for private financial gain, in violation of 8 U.S.C.

§ 1324(a)(2)(B)(ii). The defendant appeals on the grounds that the district court

allowed improper opinion testimony, that the district court erred in refusing to

grant the defendant a continuance, and that an in-court identification during trial

was so unreliable that it denied the defendant his right to a fair trial. We take

jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

I.

Late in the afternoon on February 21, 1997, Border Patrol Agent Patrick Mares stopped a car driven by the defendant on suspicion that illegal aliens were on board. After stopping the car, Agent Mares discovered that there were seven people in the car including the driver, Luis Ramirez-Piñon, and that they were all Mexican nationals. Agent Mares transported the men to the local border patrol station for interrogation. There, Agent Mares and two other agents informed the men that in previous smuggling loads, some of the material witnesses were granted work permits.

At first, the men claimed that they had purchased the car jointly and that there was no "coyote," or leader. At some point during the questioning, two men who became witnesses at trial, Cecilio Martinez-Santos and Marcos Gomez-Morales, admitted that they had paid defendant Ramirez-Piñon to transport them to the United States. The four others refused to admit that they paid defendant to smuggle them to the United States.

In subsequent interviews with the defense attorney, Mr. Martinez-Santos and Mr. Gomez-Morales repeated their initial story that the smuggling operation was a cooperative venture without a leader. The defense's theory of the case was that the witnesses had told the government agents what they wanted to hear in order to get out of jail and to obtain work permits in the United States.

The government's theory, on the other hand, was that in order to avoid criminal responsibility, Mr. Ramirez-Piñon had instructed his passengers to tell border agents that there was no "coyote" and that they had all purchased the car together. In support of this theory, Agent Mares was allowed to testify that he had been involved in approximately thirty smuggling cases, and that in almost every one the aliens had initially claimed to be part of a cooperative venture. The logical inference from that testimony was that the aliens had been coached to respond in that manner. The district court admitted Agent Mares's testimony about the prior cases under Fed. R. Evid. 701, "Opinion Testimony by Lay Witnesses."

Agent Mares then discussed this particular case, and the following exchange occurred:

> Q: And you stated that two of the passengers were kept as material witnesses. Could you explain to the jury what this means?
> A. They were witnesses that were being smuggled and -- just exactly that. They were there while the crime was going on.
> Q. Why did you pick these two over the others?
> A. Because they voluntarily gave us the information, the correct information.

R.O.A. Vol. III at 138.

## II.

The defense argues that by presenting this testimony of Agent Mares, the

- 3 -

prosecutor was impermissibly vouching for the credibility of witnesses Mr. Martinez-Santos and Mr. Gomez-Morales. The government urges that we review the decision to admit the testimony for plain error because the defense did not object on these grounds at trial. Whether the defendant made a proper objection is a close issue. The defense did object to the testimony at an earlier hearing on the grounds that, among other things, it was impermissible vouching. At trial, defense counsel referred generally to the objections made at the hearing, but did not mention vouching specifically. We find it unnecessary to determine whether the prior objection preserved the issue for appeal. Even if it did, and we review a district court's decision to admit evidence for abuse of discretion instead of plain error, see Fox v. Mazda Corp. of America, 868 F.2d 1190, 1194 (10th Cir. 1989), we find no reversible error.

The presentation of evidence by the prosecutor "is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990) (citations omitted). Agent Mares's statement that the witnesses gave him "correct" information does not meet this standard. First, the prosecutor made no personal assurances

of the witnesses' credibility. The statements objected to are those of Agent Mares. Furthermore, this exchange does not imply to the jury that there are facts unknown to them that make Agent Mares's testimony particularly reliable.

In the typical case of impermissible vouching, we review a statement by an attorney regarding the credibility of a witness's trial testimony. See, e.g., United States v. Brooks, 940 F.2d 598, 601 (10th Cir. 1991). Here, we are dealing with a statement by *a witness* about the credibility of other witnesses' *pre-trial statements*. There are too many degrees of separation to infer from this transcript any link between the prosecutor and the witnesses' trial testimony.

The defense urges us to focus on the re-direct examination, in which the prosecutor elicited from Agent Mares the fact that when he said correct, he meant "truthful." The exchange on re-direct examination, however, is hardly more indicative of vouching on the prosecutor's part than the first exchange. Furthermore, the prosecutor's attempt to clarify Agent Mares's definition of "correct" was a response to the questions defense counsel raised on cross-examination regarding that word. Thus, any vouching on the prosecutor's part would be excused due to the fact that it had been invited by the defendant's cross-examination. See Whiteley v. OKC Corp., 719 F.2d 1051, 1055 (10th Cir. 1983) (quoting United States v. Regents of New Mexico School of Mines,

185 F.2d 389, 391 (10th Cir. 1950)).

Five days prior to trial, the government filed notice of its intent to introduce expert testimony from Border Agent Roches. The agent would have testified that smugglers such as the defendant generally instruct their passengers that, if caught, they should deny that they paid anyone to take them across the border. The day before trial, the district court held a hearing and excluded this proposed testimony because the government failed to give the defense timely notice of it. The court, however, reserved a decision on whether the testimony would be admissible under Rule 701, "Opinion Testimony by Lay Witnesses." See Fed. R. Evid. 701.

On the morning of the trial, the district court ruled that the testimony was admissible under Rule 701. The government then noted that if it could introduce the evidence under that rule, it would offer the testimony of Agent Mares in place of Agent Roches. Agent Mares's testimony would be offered in the form of inferences drawn from his prior involvement in approximately 30 smuggling cases. The defense requested a continuance to investigate these cases. The court denied the motion and the case proceeded to trial that day.

We will reverse a district court decision to deny a motion to continue only if the decision was "arbitrary or unreasonable and materially prejudiced

the defendant." United States v. McKneely, 69 F.3d 1067, 1076-77 (10th Cir. 1995). Whether a denial is arbitrary or unreasonable depends on a number of factors, including:

> [1] the diligence of the party requesting the continuance; [2] the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; [3] the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; and [4] the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance.

United States v. Wynne, 993 F.2d 760, 767 (10th Cir. 1993) (citations omitted)

Here, the defendant requested the continuance immediately upon receiving the district court's ruling. Second, there is almost no doubt that if the continuance were granted, the defendant could have looked into Agent Mares's previous cases to determine how often the arrestees had untruthfully claimed that they had not paid someone to transport them to the United States. Thus, the first two factors weigh in favor of the defendant. Because this ruling took place on the morning of trial, however, the inconvenience to the court would have been great if a continuance had been granted. Furthermore, the defense has not made any showing of prejudice. For instance, on cross-examination, the defense was able to elicit from Agent Mares an admission that aliens sometimes attempt to cross in groups without paying a particular person to lead them. The defense, however, did not continue this line of questioning.

Furthermore, the defense did not include anything in the record regarding Agent Mares's previous cases that demonstrates material prejudice. On balance, the weighing of the <u>Wynne</u> factors does not demonstrate that the district court acted arbitrarily or unreasonably in denying the motion to continue.

IV.

Next, the defendant argues that the in-court identifications of the defendant by Mr. Martinez-Santos and Mr. Gomez-Morales were so unreliable that they violated the defendant's right to a fair trial. We review the constitutionality of identification procedures *de novo*. <u>See</u> <u>Archuleta v. Kerby</u>, 864 F.2d 709, 710-11 (10th Cir. 1989). We review any factual basis for that conclusion for clear error. <u>See</u> <u>id.</u>

Mr. Martinez-Santos was the first to identify the defendant. The exchange between him and the prosecutor went as follows:

Q. So you went to the plaza to look for someone to cross you
into the United States?
A. Yes.
Q. Did you find someone?
A. Yes, him. Him.
Q. Who do you mean by "him"?
A. The defendant who is here.
Q. The man sitting to your right?
MS. GARDNER: Your Honor, I'm going to object. She's
being leading.
MS. MICKEY: Your Honor, I believe one of the exceptions to
leading questions on direct examination is if you have a

witness who is having difficulty understanding.

THE COURT: Well, this is being interpreted to him. But ask your questions in a form that are not leading.

Q. (By Ms. Mickey) What do you mean by "him"?

A. The one who was bringing us.

Q. Who was that person?

A. I really don't know the person.

Q. Is he in the courtroom today?

A. I don't know.

Q. Could you please take a look to your right?

MS. GARDNER: Your Honor, I'm going to object that this is unduly prejudicial.

THE COURT: It's overruled.

Q. (By Ms. Mickey) Mr. Martinez, would you please take a look to your right. Is that the man who agreed to help you get to the United States?

MS. GARDNER: Object.

THE WITNESS: Yes.

R.O.A. Vol III at 175-76. Mr. Gomez-Morales identified the defendant next.

His testimony was as follows:

Q. And did you find someone that would cross you?

A. Yes.

Q. Who was that person?

A. The one who brought us.

Q. Who was that?

A. The one who brought us.

Q. Can you look around the courtroom and tell me if that person is here today?

A. No, I don't find him present.

Q. Can you look to the defense table and look closely at the man to your right in the pink shirt?

A. Yes, that man.

Q. That's the man who brought you into the United States?

A. Yes.

R.O.A. Vol III at 238.

The prosecutor's questions in this case were extremely suggestive. The threat to defendant's right to a fair trial, however, is much less serious in this case than when the in-court identification is based on a prior, suggestive out-of-court identification.

> The concern with in-court identification, where there has been suggestive pretrial identification, is that the witness later identifies the person in court, not from his or her recollection of observations at the time of the crime charged, but from the suggestive pretrial identification. Because the jurors are not present to observe the pretrial identification, they are not able to observe the witness making that initial identification. . . . When the initial identification is in court, there are different considerations. The jury can observe the witness during the identification process and is able to evaluate the reliability of the initial identification.

United States v. Robertson, 19 F.3d 1318, 1323 (10th Cir. 1994) (quoting United States v. Domina, 784 F.2d 1361, 1367-69 (9th Cir. 1986) (citations omitted)). Given the considerations above, any suggestiveness in the courtroom identification procedures is generally a matter for the jury to consider during deliberations. See Romero v. Tansy, 46 F.3d 1024, 1032 (10th Cir. 1995). The district court should take the identification issue away from the jury only if "there is a 'very substantial likelihood of irreparable misidentification.'" United States v. Kimball, 73 F.3d 269, 273 (10th Cir. 1995) (quoting Robertson, 19 F.3d at 1323).

Although the questions were suggestive, they did not present a

substantial likelihood of irreparable misidentification. First, the eyewitnesses both spent a number of hours with the defendant, which minimizes the chances that they would misidentify him even under such suggestive questioning. More importantly, perhaps, the questioning proceeded in a way that exposed the effect of the leading questions. Each witness was asked to pick the defendant out of the courtroom and neither could do it. Only when they were led by the prosecution to the defense table did they positively identify the defendant as the man they paid. The jury, therefore, was capable of weighing the eyewitnesses' credibility in light of the prosecution's method of questioning. Any misidentification that took place was reparable—that is, the identifications could have been discounted in the jury room.

V.

We find that the prosecution did not impermissibly vouch for the credibility of the alien witnesses, that the district court did not abuse its discretion in denying the defense's request for a continuance, and that the in-court identifications of the defendant did not violate his right to a fair trial. Given the above, we find it unnecessary to address the defendant's claim of

cumulative error.

We AFFIRM.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Circuit Judge